S08A0426. FAIR v. THE STATE.
S08A0427. JOLLY v. THE STATE.
(664 SE2d 227)

CARLEY, Justice.

This is an interim appellate review of two related cases in which the State seeks the death penalty. Antron Dawayne Fair and Damon Antwon Jolly allegedly killed Bibb County Deputy Joseph Whitehead, who was on assignment as an investigator with the Middle Georgia Drug Task Force. The State contends that in the early morning hours of March 23, 2006, both defendants opened fire on Deputy Whitehead as he and other members of the Task Force and the Bibb County Drug Unit were executing a "no-knock" warrant at 3135 Atherton Street within the City of Macon in Bibb County. Pursuant to OCGA § 17-10-35.1, we granted their applications for interim review to consider the following issues: (1) whether the trial court erred in denying the defendants' motions for a pre-trial determination of whether they are entitled to immunity from prosecution under OCGA § 16-3-24.2; (2) whether the trial court erred in denying the defendants' motions regarding an alleged scienter element in the OCGA § 17-10-30 (b) (8) statutory aggravating circumstance; and (3) in Fair's case, whether the trial court erred regarding his motion to suppress evidence seized during a search with a warrant.

1. Both Fair and Jolly filed motions to dismiss the indictment against them on the ground that they are immune from prosecution under OCGA § 16-3-24.2, which provides in relevant part that "[a] person who uses threats or force in accordance with Code Section . . . 16-3-23 or . . . 16-3-24 shall be immune from criminal prosecution . . . ." OCGA § 16-3-23 governs the use of force in defense of a habitation, and OCGA § 16-3-24 governs its use in defense of personal property or real property other than a habitation. After conducting hearings on the defendants' motions, the trial court reserved its ruling in both defendants' cases until trial, stating that "[w]hether [the defendants] can avail [themselves] of a defense of habitation will be decided by the court at the conclusion of the evidence and prior to any jury charge." The defendants contend that, under OCGA § 16-3-24.2, the issue of immunity is to be determined by the trial court pre-trial, and we note that the State is in agreement and in fact filed motions in the trial court in both cases requesting that the trial court reconsider its orders reserving its ruling on the defendants' motions to dismiss.

The construction of OCGA § 16-3-24.2 is an issue of first impression in this Court. However, the defendants cite and rely upon *Boggs v. State*, 261 Ga. App. 104, 106 (581 SE2d 722) (2003). There, the Court of Appeals focused on the plain language of the statute, see *Sizemore v. State*, 262 Ga. 214, 216 (416 SE2d 500) (1992), and held that

> [a]ccording to Black's Law Dictionary, one who is immune is exempt or free from duty or penalty, [cit.] and prosecution is defined as "(a) criminal action; a proceeding instituted and carried on by due course of law, before a competent tribunal, for the purpose of determining the guilt or innocence of a person charged with crime." Therefore, by the plain meaning of [immune from prosecution] and the other language in the statute, the statute must be construed to bar criminal proceedings against persons who use force under the circumstances set forth in OCGA § 16-3-23 or § 16-3-24. Further, as the statute provides that such person "*shall* be immune from criminal prosecution," the decision as to whether a person is immune under OCGA § 16-3-24.2 must be determined by the trial court [as a matter of law] before the trial of that person commences. (Emphasis supplied.)

*Boggs*, supra at 106. See *O'Donnell v. Durham*, 275 Ga. 860, 861 (3) (573 SE2d 23) (2002) (" 'Shall' is generally construed as a word of mandatory import."). Because we are of the opinion that the Court of Appeals correctly construed and applied OCGA § 16-3-24.2 in *Boggs*, we hold that the trial court erred in refusing to rule pre-trial on the defendants' motions, and we therefore remand for a pre-trial determination of whether the defendants are entitled to immunity from prosecution under OCGA § 16-3-24.2.

2. The indictment in this case charges Fair and Jolly with one count of malice murder and three counts of felony murder. The felony murder charges are predicated on the felonies of aggravated assault, possession of marijuana with the intent to distribute, and possession of cocaine with the intent to distribute. The trial court denied the defendants' requests to have the jury charged in both the guilt/innocence phase and in the sentencing phase, if necessary, that the State bears the burden to prove beyond a reasonable doubt that the defendants knew that the victim was a peace officer engaged in the performance of his duties at the time of the shooting.

(a) The defendants do not contend that the felony murder charge predicated on aggravated assault alleges the crime of aggravated assault on a peace officer, OCGA § 16-5-21 (c), and the record shows

that, at a pre-trial hearing, the State and the defendants agreed that the felony underlying that charge is aggravated assault and *not* the crime of aggravated assault on a peace officer, which would require proof of knowledge that the victim was an officer. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, Third Ed., § 2.05.25. Despite this, the defendants contend that because the indictment charges them with four counts of murder against "Bibb County Sheriff's Deputy Joseph Whitehead," the allegation that the victim was a sheriff's deputy has become an essential element of each count. Therefore, although not directed by this Court to address on interim review the issue of victim status scienter in the guilt/innocence phase, the defendants argue that the State must prove beyond a reasonable doubt in the guilt/innocence phase that they were aware at the time of the shooting that Deputy Whitehead was a peace officer engaged in the performance of his official duties.

"An allegation in an indictment that is wholly unnecessary to constitute the offense[s] charged is mere surplusage." *Wood v. State*, 69 Ga. App. 450, 450 (26 SE2d 140) (1943). The identification of the victim as a law enforcement officer by appending "Bibb County Sheriff's Deputy" to his name describes neither the offenses charged nor the manner in which they were committed. Therefore, it is not a material averment and need not be proven, see *McBride v. State*, 202 Ga. App. 556, 557-558 (415 SE2d 13) (1992), and the trial court properly denied the defendants' motions for a jury instruction to the contrary in the guilt/innocence phase.

(b) The defendants requested this same instruction in the sentencing phase, if necessary, based on the fact that, in the State's notice of intent to seek the death penalty, it identified as the sole statutory aggravating circumstance with respect to all counts the fact that "[t]he offense of murder was committed against a peace officer while he was engaged in the performance of his official duties." The code section which describes that aggravating circumstance reads as follows: "The offense of murder was committed against any peace officer, corrections employee, or firefighter while engaged in the performance of his official duties." OCGA § 17-10-30 (b) (8). That code section is silent regarding the defendant's knowledge of the officer's status, and this Court has not previously addressed whether victim status scienter is required in order for the jury to find the (b) (8) statutory aggravating circumstance beyond a reasonable doubt. The determination of what mental state is required in those criminal statutes where no culpable mental state is expressly designated is a matter of statutory construction. See *State v. Miller*, 260 Ga. 669 (2) (398 SE2d 547) (1990). See also *Daniels v. State*, 264 Ga. 460, 461 (2) (448 SE2d 185) (1994). "In construing a

statute, the cardinal rule is to glean the intent of the legislature. [Cits.]" *Alford v. Public Service Comm.*, 262 Ga. 386, 387 (1) (a) (418 SE2d 13) (1992). See also *Stephen v. Hopper*, 241 Ga. 596, 602-603 (4) (247 SE2d 92) (1978) (analyzing intent of legislature in construing (b) (1) statutory aggravating circumstance).

The State maintains that, because the language of the (b) (8) statutory aggravating circumstance does not contain the word "knowingly," it should not be construed to require knowledge that the victim was a peace officer. Contending that this Court should consider the statutory construction given to similar statutes in Georgia, the State correctly points out that the word "knowingly" appears in the criminal statute defining aggravated assault against a peace officer, OCGA § 16-5-21 (c), and in the criminal statute defining aggravated battery against a peace officer, OCGA § 16-5-24 (c), and that both crimes have been construed by our appellate courts as requiring knowledge of the victim's status as a police officer as an element of the crime. *Bundren v. State*, 247 Ga. 180, 181 (2) (274 SE2d 455) (1981). See also *Chandler v. State*, 204 Ga. App. 816, 821 (3) (421 SE2d 288) (1992) (applying *Bundren*, supra, to aggravated battery on a peace officer). These separate crimes against police officers were the subject of legislation enacted subsequent to the 1973 adoption of our revised death penalty statute and its inclusion of the (b) (8) statutory aggravating circumstance. Ga. L. 1973, pp. 159, 163-165, § 3; Ga. L. 1976, pp. 543-544, §§ 1, 2. However, when the General Assembly adopted the latter code sections, it knew that "knowingly" was not required in the (b) (8) aggravating circumstance and nevertheless made it mandatory to prove the defendant's knowledge with regard to the aggravated assault and aggravated battery provisions. Furthermore, the word "knowingly" appears in the (b) (3) statutory aggravating circumstance which is part of the same statute and was enacted simultaneously with the (b) (8) aggravating circumstance. If the General Assembly had intended to require knowledge of the victim's status as a peace officer in order for the (b) (8) aggravating circumstance to apply, "the statutory history shows that it knew how to do so. 'We must presume that its failure to do so was a matter of considered choice.' [Cit.]" *Inland Paperboard & Packaging v. Ga. Dept. of Revenue*, 274 Ga. App. 101, 104 (616 SE2d 873) (2005). See also *Bauerband v. Jackson County*, 278 Ga. 222, 225-226 (3) (598 SE2d 444) (2004).

In connection with the imposition of the death penalty, this Court often says that "death is different."

Death penalty cases *do* require closer examination and the additional safeguards provided by law. The citizens of this state should be, must be, appalled at the prospect of

executing . . . a murderer undeserving of the ultimate punishment. . . . "Death is different" is a crucial reminder of the gravity of a sentence where the state seeks to punish a defendant by taking his life, and of the need for procedural safeguards in the determination and carrying out of such a sentence, but it should not be used to construct . . . rights that do not exist, or to usurp the legislature's role in determining the structure of our criminal justice system . . . . (Emphasis in original.)

*Gibson v. Turpin*, 270 Ga. 855, 859-860 (1) (513 SE2d 186) (1999). Furthermore, the death of a human being as a result of a crime is different from an injury suffered because of a criminal act. It is logical to conclude that the General Assembly purposely made such a distinction. A contrary conclusion would in some cases prevent the imposition of the death penalty for the murder of an officer enforcing an unpopular law and would wholly preclude that punishment for the murder of an "agent acting under cover. . . . The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected. In a case of this kind the offender takes his victim as he finds him." *United States v. Feola*, 420 U. S. 671, 684-685 (II) (95 SC 1255, 43 LE2d 541) (1975) (involving a statute which prohibited assault on a federal officer and did not require proof of knowledge that the intended victims were federal officers).

The purpose of the inclusion of the statutory aggravating circumstances in the 1973 Act, which was introduced in the House as HB 12, was to ensure that it would withstand future constitutional attack. However, the issue before us today is not a constitutional one. Our General Assembly knew the importance and gravity of the bill it was considering. As revealed by a review of the House and Senate Journals, the vote in neither the House nor Senate on this bill was unanimous. In fact, after the Judiciary Committee recommended a "do pass" of HB 12 by committee substitute, the House recommitted the bill to the Judiciary Committee without passing it at that time. Georgia House Journal, Regular Session 1973, pp. 330-331. Later, the bill was passed by substitute after several amendments were proposed and defeated. Georgia House Journal, Regular Session 1973, pp. 606-607. The Senate finally passed the bill by a split vote after defeating several floor amendments. Georgia Senate Journal, Regular Session 1973, p. 505. The General Assembly fully followed the legislative process, enacted the law and has never amended the language setting forth the (b) (8) aggravating circumstance in any way. *Bauerband v. Jackson County*, supra; *Inland Paperboard & Packaging v. Ga. Dept. of Revenue*, supra.

Accordingly, we construe the (b) (8) statutory aggravating circumstance as not requiring knowledge on the part of the defendant that the victim was a peace officer or other designated official engaged in the performance of his duties. Therefore, the trial court correctly denied the defendants' requests for a jury instruction to the contrary in the sentencing phase.

3. On March 20, 2006, Deputy Whitehead was granted the no-knock warrant that the officers were executing at the time he was shot. Fair challenges the validity of the search warrant on several bases.

(a) *The things to be seized.* Fair initially contends that the warrant was void because it failed to state with sufficient particularity the things to be seized. The warrant authorized the executing officers to search "for evidence of the crime of **Violation of Georgia Controlled Substance[s] Act**." (Emphasis in original.) The Act regulates the manufacture, delivery, distribution, possession, or sale of definite lists of drugs and their derivatives and certain other narcotics and illegal drugs. See OCGA §§ 16-13-20 through 16-13-56.

In evaluating the particularity of a warrant's description, we must determine "whether the description . . . is sufficient to enable 'a prudent officer executing the warrant to locate it definitely and with reasonable certainty.' [Cit.]" *Bishop v. State*, 271 Ga. 291, 294 (6) (519 SE2d 206) (1999). Furthermore, "the degree of the description's specificity is flexible and will vary with the circumstances involved." *Dobbins v. State*, 262 Ga. 161, 164 (3) (415 SE2d 168) (1992).

The warrant at issue here was targeted at evidence relating to the violation of a specific statute directed at illegal drug possession and trafficking, crimes which, because of their nature, generate distinctive evidence and inherently limit the items to be sought. Indeed, several jurisdictions have held that "[m]ore specificity is not required by the Constitution" where "items to be seized [are] limited to those relating to 'the smuggling, packing, distribution and use of controlled substances.' " *United States v. Ladd*, 704 F2d 134, 136 (4th Cir. 1983). See *United States v. Calisto*, 838 F2d 711, 716 (III) (3d Cir. 1988) (" 'items used in the manufacture, sale, use, etc. of controlled substances' " sufficient and covered guns); *United States v. Hayes*, 794 F2d 1348, 1355 (III) (B) (9th Cir. 1986) (" 'correspondence concerning the procuring, transferring, administering, prescribing or dispensing of controlled substances by [defendant] . . . which constitute[s] evidence of possible violations of 21 USC 841 (a) (1) and 21 USC 843 (a) (3)' "); *Carlton v. State*, 449 S2d 250, 250 (Fla. 1984) (" 'all controlled substances and other matters of [sic] things pertaining or relating to said possessions and sale of controlled

substance violations of chapter 893, Florida Statutes . . .' ' "). See also *Stanford v. Texas*, 379 U. S. 476, 485-486 (85 SC 506, 13 LE2d 431) (1965) (implying that less exactitude may be required in warrants describing contraband such as narcotics); 2 LaFave, *Search & Seizure* § 4.6 (b), pp. 620-621 (4th ed. 2004) (noting courts' approval of warrant descriptions such as " 'narcotic drugs,' " " 'any illegal drugs,' " " 'controlled substances,' " and " 'narcotics, dangerous drugs and narcotics paraphernalia' "). We therefore hold that the warrant's description here sufficiently described the items sought so as to enable the executing officers to locate them " 'definitely and with reasonable certainty.' " *Bishop*, supra. See also *Conrad v. State*, 217 Ga. App. 388, 390 (2) (457 SE2d 592) (1995) (warrant sufficiently particular where it described items to be seized as " '[m]etham-pethamine, other drugs/controlled substances, and other items indicative of the sale/distribution of controlled substances/dangerous drugs which are being possessed in violation of Georgia Law' "). Accordingly, the trial court did not err in denying Fair's motion to suppress on the basis of lack of particularity in the warrant's description.

(b) *Probable cause.* Fair also contends that the affidavit upon which the search warrant was issued did not establish probable cause for the warrant's issuance. In determining whether probable cause exists, the magistrate's task is

> "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." [Cit.]

*DeYoung v. State*, 268 Ga. 780, 787 (7) (493 SE2d 157) (1997). On review, this Court is limited to "determin[ing] if the magistrate had a 'substantial basis' for concluding that probable cause existed to issue the search warrant[,]" and must afford substantial deference to the magistrate's decision. *DeYoung*, supra.

In Fair's case, the affidavit contained information from a "concerned citizen" and two informants designated as "Source one" and "Source two." The trial court relied on information from Source one, the concerned citizen, and Deputy Whitehead's corroboration in holding that the magistrate correctly found probable cause on which to issue the warrant. Pretermitting whether the trial court was correct in disregarding the information from Source two as unreliable and stale, we conclude that the affidavit still provided the magistrate with a substantial basis for finding probable cause.

Source one's basis of knowledge was adequately established by the affidavit's specific allegations that that informant, who "kn[ew] what Marijuana look[ed] like and how it is packaged for sale," had in the preceding 72 hours been on the premises at 3135 Atherton Street and had witnessed at least two individuals therein package marijuana for distribution. Deputy Whitehead's recitations that he had known Source one for approximately three years and that he or she had provided information leading to drug seizures and approximately ten felony arrests in the past sufficiently established Source one's veracity and reliability. See *Bryan v. State*, 137 Ga. App. 169, 169 (1) (B) (223 SE2d 219) (1976).

As to the report from the concerned citizen that narcotics were being sold from the subject address, "[t]he magistrate was given nothing other than the affiant's conclusory statement that the tipster was a concerned citizen." *State v. Brown*, 186 Ga. App. 155, 158 (2) (366 SE2d 816) (1988). See also 2 LaFave, supra at § 3.4 (a), pp. 238-239 ("[I]t should not be deemed sufficient that the police have alleged in a rather conclusory fashion that the person was . . . a 'concerned citizen. . . .' "). Thus, that informant is not entitled to a preferred status, and the information he or she provided is relegated "to the status of rumor." *Brown*, supra. Moreover, we fail to see how any of the facts gathered from Deputy Whitehead's independent investigation corroborate the information supplied by the informant to establish sufficiently his or her credibility. *Shivers v. State*, 258 Ga. App. 253, 255 (573 SE2d 494) (2002) (holding that meaningful corroboration requires that information include details relating to future actions of third parties not easily predicted or similar information not available to general public). Nevertheless, "because [Source one]'s veracity, reliability, and basis of knowledge were sufficiently established, corroboration was not required." *Sanders v. State*, 252 Ga. App. 609, 612 (1) (556 SE2d 505) (2001). Therefore, even after excising the unreliable information, the affidavit still provided the magistrate with a substantial basis for concluding that a fair probability existed that evidence of a crime would be found at the premises. See *State v. Hunter*, 282 Ga. 278, 280 (646 SE2d 465) (2007).

(c) *Execution*. Although the trial court found that, once the unreliable information from Source two was excised, the remaining information was insufficient to authorize the "no-knock" provision in the warrant, it held that the officers' entry was justified by exigent circumstances. "Exigent circumstances exist where the police have 'reasonable grounds to believe that forewarning would either greatly increase their peril or lead to the immediate destruction of the evidence.' [Cit.]" *Poole v. State*, 266 Ga. App. 113, 115 (1) (596 SE2d 420) (2004). In order to meet the reasonableness standard for a

no-knock entry, the circumstances must have been such as would have led the officers to conclude that if they announced their authority and purpose, they could be harmed or evidence could be destroyed. *Smithson v. State*, 275 Ga. App. 591, 596 (3) (621 SE2d 783) (2005). Whether exigent circumstances existed at the time of the warrant's execution is a question of fact, and this Court reviews police actions from the standpoint of a "reasonable officer" and "must measure those actions from the foresight of an officer acting in a quickly developing situation and not from the hindsight of which judges have benefit, [cit.]. . . ." *Bolton v. State*, 258 Ga. App. 217, 219 (573 SE2d 479) (2002).

The evidence at the suppression hearing showed that Deputy Whitehead briefed the officers before their entry that there was a surveillance camera at the front door of the premises, that drugs and weapons were suspected to be inside, and that there was a metal gate barring the front door, which would both delay the officers' entry and create a disturbance that could forewarn the occupants of the officers' presence. Officers who participated in the warrant's execution also testified that, as they approached the house, they became concerned that the occupants had been alerted to their presence because several dogs started barking from the rear of the house. A "reasonable officer" could surmise that, if the occupants were alerted, they would be able to identify the officers through the surveillance system at the front door, giving the officers reasonable grounds to believe that knocking could increase their peril or lead to the immediate destruction of evidence. Accordingly, we conclude that the officers' manner of entry was justified under the exigent circumstance doctrine. See *Alvarado v. State*, 271 Ga. App. 714, 715-716 (1) (610 SE2d 675) (2005) (noting that " 'the need for the exigent circumstance doctrine is particularly compelling in narcotics cases' "). Although we find that the officers' manner of entry was authorized here, we note that the Supreme Court of the United States has held that the Fourth Amendment does not require the suppression of all evidence found in a search in which the "knock-and-announce" rule was violated. *Hudson v. Michigan*, 547 U. S. 586 (III) (126 SC 2159, 165 LE2d 56) (2006).

Fair also contends that, because the warrant was executed in a residential neighborhood at 1:15 a.m., its execution was unreasonable and thus in violation of OCGA § 17-5-26 ("search warrant may be executed at any reasonable time"). This Court has never held that, under OCGA § 17-5-26, the nighttime execution of a warrant is presumptively unreasonable. Compare Rule 41 (e) (2) (A) (ii), Fed. R. Crim. P. (stating that a warrant must direct that its execution occur "during the daytime, unless the judge for good cause expressly authorizes execution at another time"). Rather, the reasonableness

of the time of a warrant's execution must be determined on a case-by-case basis looking at the totality of circumstances. See *Williams v. State*, 142 Ga. App. 764, 767 (5) (236 SE2d 893) (1977) (execution of two warrants at a business in early morning hours justified to avoid embarrassment of daytime search and by fact that one of warrants indicated stolen goods were about to be moved).

In this case, the officers' testimony at the suppression hearing established that Deputy Whitehead drove by the house just prior to executing the warrant and then reported to the other officers that there appeared to be activity inside. The officers also testified that it was not unusual for the drug unit to execute warrants regarding drug trafficking in the early morning hours, because the officers knew from experience that the peak time for drug dealers to conduct business was after midnight when the dealers thought the drug investigators had ceased operations for the night. Under these circumstances, we find that the time of the warrant's execution was not unreasonable. See 41 ALR 5th 171, § 16 (a)-(f) (1996) (citing numerous cases in which courts have upheld nighttime execution of warrants based on affidavits averring that informants had observed the sale of illegal drugs on the premises).

(d) *Those items seized incident to arrest and in plain view.* The trial court also found admissible those items seized incident to the defendants' arrest for the shooting of Deputy Whitehead and those items seized in plain view during the processing of the crime scene.

Fair contends that "the uncontroverted evidence is that [he and Jolly] had no idea who was entering the house, that they believed their lives were in danger, [that] their actions were reasonable, [and] thus [that] their arrests were invalid," necessitating the suppression of all evidence seized pursuant thereto. See OCGA § 17-5-30 (a); *Harvey v. State*, 266 Ga. 671, 672 (469 SE2d 176) (1996) (" 'defendant aggrieved by an unlawful search and seizure' is entitled to suppression of the evidence"). However, at the time of the defendants' arrests, the officers were not required to anticipate whether the defendants might be able to present a successful defense of justification. All that the officers were required to determine was whether there was probable cause for their arrests. *State v. Stringer*, 258 Ga. 605, 605 (372 SE2d 426) (1988).

In addition, given the facts that one officer had been shot and mortally wounded, that the officers were still presented with a dangerous situation, that contraband was believed to be in the home and in immediate danger of destruction, that it was approximately 1:15 a.m. when the shooting occurred and a magistrate was not likely to be readily available, and that the armed suspects were likely to flee if given the opportunity, the defendants' arrests within the house were authorized by the presence of exigent circumstances. See

*Carranza v. State*, 266 Ga. 263, 268 (1) (467 SE2d 315) (1996) (lawful arrest of individual committing offense in presence of police in his or her home requires warrant, consent to entry, or exigent circumstances). Accordingly, Fair's arrest was lawful, and the items that were removed from his person and immediate presence pursuant to his being taken into custody were properly seized incident to his valid arrest. See OCGA § 17-5-1; *State v. Camp*, 175 Ga. App. 591, 594 (2) (333 SE2d 896) (1985) (to prevent harm to officers and concealment or destruction of evidence, search incident to arrest may encompass area within immediate control of arrestee).

Moreover, once the officers arrested Fair and Jolly, they were also authorized

> to ensure their own safety and prevent the destruction of evidence by conducting a limited search of the entire house for other occupants; they were also authorized to seize [any items of contraband or evidence of a crime] they found in plain view during this "securing" of the house. [Cit.]

*Jenkins v. State*, 223 Ga. App. 486, 488 (2) (477 SE2d 910) (1996). See also 3 LaFave, supra at § 6.5 (e), pp. 447-449 (noting that seizure of evidence seen in plain view during the securing of the residence is permissible).

> For evidence to be admissible under [the plain view] doctrine, the officer collecting the evidence must not have violated the Fourth Amendment in arriving at the place from which he or she sees the evidence. [Cit.] Moreover, the incriminating nature of the object must be " 'immediately apparent.' " [Cit.] This requirement means that the officer must have probable cause "to believe that the item in question is evidence of a crime or is contraband." [Cit.]

*Moss v. State*, 275 Ga. 96, 104 (14) (561 SE2d 382) (2002).

Our review of the approximately 15-minute video recording of the premises, which was viewed by the trial court, supports the officers' testimony that guns, shell casings, significant amounts of cash, and items appearing to be crack cocaine, all of which, under the circumstances, would present probable cause as being contraband or evidence of the crime of Deputy Whitehead's shooting, were in plain view. As the examination of the crime scene by the officers did not exceed constitutional bounds, the trial court's order limiting admissibility to items seized incident to Fair's arrest and in plain view during the processing of the crime scene was not error. See *Hatten v. State*, 253 Ga. 24, 25 (2) (315 SE2d 893) (1984) (finding constitu-

tional the warrantless three to six hour examination of murder scene where officers handcuffed defendant, secured area, and seized items related to murder).

Fair further argues that, even if the search was valid, the seizures were illegal because they were made by Sgt. Gatlin, an investigator with the Macon Police Department who was called to process the crime scene. The testimony at the suppression hearing shows that, once the shooting occurred and the defendants were searched prior to being taken into custody, Sgt. Gatlin was called because a homicide had occurred within the jurisdiction of the Macon Police Department. The record shows that, with the assistance of crime scene investigators from the Bibb County Sheriff's Office, Sgt. Gatlin gathered and processed the evidence over the course of a four to five hour period. The fact that Sgt. Gatlin, who had training in processing crime scenes, physically collected the evidence that the executing officers had discovered earlier did not diminish the lawfulness of the seizures. *Phillips v. State*, 269 Ga. App. 619, 623 (2) (604 SE2d 520) (2004).

(e) *Right of confrontation.* Finally, there is no merit to Fair's claim that, because Deputy Whitehead was unavailable for cross-examination and the confidential informants' identities were not disclosed at the suppression hearing, evidence should be suppressed as a result of a violation of Fair's Sixth Amendment right to confrontation. Because Deputy Whitehead's partner testified from his personal knowledge that neither confidential informant was present at the time the search warrant was executed, the State has established that they were neither witnesses nor participants in the crimes charged and, thus, their identities did not need to be disclosed at the motion to suppress hearing. OCGA §§ 24-9-21 (4), 24-9-27 (d); *Leonard v. State*, 228 Ga. App. 792, 794 (2) (492 SE2d 747) (1997). Moreover, "guilt or innocence is not at issue on a motion to suppress and does not involve the issue of right of confrontation. [Cits.]" *Leonard*, supra at 794. See also *Gresham v. Edwards*, 281 Ga. 881, 882-884 (2) (644 SE2d 122) (2007) (holding that the right to confront witnesses at trial under *Crawford v. Washington*, 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004), does not apply to preliminary hearings, because the right of confrontation is a trial right, and citing with approval several decisions from other states holding that *Crawford* is not applicable to pre-trial suppression hearings for that reason).

(f) *Standing.* In light of the foregoing, it is unnecessary for us to address the State's claim that Fair lacked standing to contest the warrant.

*Judgment affirmed in part, reversed in part, and case remanded with direction in Case Number S08A0426. Judgment affirmed in*

*part, reversed in part, and case remanded with direction in Case Number S08A0427. All the Justices concur, except Sears, C. J., and Hunstein, P. J., who concur in part and dissent in part.*

HUNSTEIN, Presiding Justice, concurring in part and dissenting in part.

While I concur fully in the majority's opinion herein as to Divisions 1, 2 (a), and 3, I cannot agree with the majority's determination that the statutory aggravating circumstance set forth in OCGA § 17-10-30 (b) (8) does not require a finding of victim status scienter. Thus, as discussed below, I respectfully dissent to the majority's holding in Division 2 (b).

As the majority observes, "[t]he determination of what mental state is required in those criminal statutes where no culpable mental state is expressly designated is a matter of statutory construction. [Cit.]" Maj. Op. at 167. In its effort to glean the Legislature's intent in enacting OCGA § 17-10-30 (b) (8), the majority adopts the mode of analysis propounded by the State, comparing the absence of the word "knowingly" in the (b) (8) statutory aggravating circumstance to that word's inclusion in the criminal statutes defining aggravated assault and aggravated battery against a peace officer, see OCGA §§ 16-5-21 (c) and 16-5-24 (c), as well as in the statutory aggravating circumstance set forth in OCGA § 17-10-30 (b) (3). While I agree that this apparent contrast is worthy of note, I do not accept it as dispositive.[1] Rather, I find considerably more persuasive the legislative history reflecting the purpose of the enactment of the statutory aggravating circumstances as well as the rules of statutory construction specifically applicable to penal statutes, which together lead me to reject the majority's conclusion.

In determining the Legislature's intent with respect to the (b) (8) statutory aggravating circumstance, " 'it is appropriate for the court to look to the old law and the evil which the legislature sought

---

[1] Indeed, as the majority is constrained to acknowledge, the two statutes regarding criminal offenses against police officers, which the majority finds so compelling, were enacted *after* the adoption of the (b) (8) statutory aggravating circumstance, see Ga. L. 1973, pp. 159, 163-165, § 3; Ga. L. 1976, pp. 543-544, §§ 1, 2, and they are thus hardly illuminating as to the Legislature's intent at the time it enacted (b) (8). As to the differences in language between (b) (8) and (b) (3), I believe, as discussed below, that a broader look at all eleven statutory aggravating circumstances evidences the Legislature's intent to require some element of mens rea as to each aggravating circumstance.

In addition, I note that inferring an intent element where a criminal statute is silent is not unprecedented in this Court. See, e.g., *State v. Miller*, 260 Ga. 669, 674 (2) (398 SE2d 547) (1990) (construing Anti-Mask Act as applying only where defendant "knows or reasonably should know that the conduct provokes a reasonable apprehension of intimidation, threats or violence").

to correct in enacting the new law and the remedy provided therefor.' [Cit.]" *State v. Mulkey*, 252 Ga. 201, 204 (2) (312 SE2d 601) (1984).[2] Accordingly, it is noteworthy that OCGA § 17-10-30 was enacted in 1973, see Ga. L. 1973, pp. 159, 163-165, § 3, in the aftermath of the United States Supreme Court's decision in *Furman v. Georgia*, 408 U. S. 238 (92 SC 2726, 33 LE2d 346) (1972), which had invalidated the Georgia death penalty statutes then in effect. In an effort to reinstate the death penalty in Georgia

> [i]n the wake of *Furman*, Georgia['s legislature] amended its capital punishment statute . . . to narrow the class of murderers subject to capital punishment by specifying 10 [now 11] statutory aggravating circumstances, one of which must be found by the jury to exist beyond a reasonable doubt before a death sentence can ever be imposed.

(Citations and footnote omitted.) *Gregg v. Georgia*, 428 U. S. 153, 196-197 (IV) (B) (96 SC 2909, 49 LE2d 859) (1976). Thus, the legislative intent was to focus the death penalty with greater precision in order to, as the majority puts it, "ensure that [the revised death penalty statute] would withstand future constitutional attack." Maj. Op. at 169.[3]

Part of the method of narrowing the death penalty statute was to explicitly "require the jury to consider the circumstances of the crime *and* the criminal before it recommend[ed] sentence." (Emphasis supplied.) *Gregg*, supra, 428 U. S. at 197 (IV) (B). Indeed, in recognition of the oft-quoted maxim that "death is different," see Maj. Op. at 168, "the Georgia death penalty statute is crafted to narrow the class of murderers who may receive the death penalty *to the most culpable*." (Emphasis supplied.) *Gibson v. Turpin*, 270 Ga. 855, 859, n. 3 (1) (513 SE2d 186) (1999). See also *Atkins v. Virginia*, 536 U. S. 304, 319 (IV) (122 SC 2242, 153 LE2d 335) (2002) (death penalty must be limited to offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes

---

[2] In this regard, I would stress with particular interest the fact that we have in the past looked to the legislative history of a statute in construing an intent requirement even where the word "knowingly" appeared in the text of the statute in question. See *Bundren v. State*, 247 Ga. 180, 181 (2) (274 SE2d 455) (1981) (looking to history of statute regarding aggravated assault of a police officer to glean legislative intent as to whether knowledge was essential element of offense).

[3] See also Georgia Senate Journal, Regular Session 1973, pp. 505-506, Remarks of Senator Ward of the 39th District ("I oppose the position taken by the Senate in passing the bill (HB 12) to reinstate the death penalty in Georgia. . . . In Furman v. Georgia . . . the Court declared that 'the imposition and carrying out the death penalty [is unconstitutional].' I . . . have . . . doubts that the bill being voted upon today will withstand a constitutional attack . . . .").

them "the most deserving of execution"); *California v. Brown*, 479 U. S. 538, 545 (107 SC 837, 93 LE2d 934) (1987) (O'Connor, J., concurring) (observing the "emphasis on culpability in sentencing decisions [that] has long been reflected in Anglo-American jurisprudence").

Bearing in mind the legislative purpose of winnowing the class of death penalty-eligible offenders to that subset thereof who exhibit enhanced culpability, such enhanced culpability could be manifested in (b) (8) only through the inclusion of a knowledge element. Clearly, a defendant who knowingly murders a peace officer or other public servant designated in the (b) (8) statutory aggravating circumstance is more culpable than one who does not know the status of his victim. Without such knowledge, there is nothing to distinguish the defendant who murders a victim who by happenstance was such a public servant from the defendant who murders any other victim, and thus nothing to specifically justify imposition of the ultimate punishment. See *Livingston v. State*, 264 Ga. 402, 404 (1) (b) & n. 5 (444 SE2d 748) (1994) (recognizing that "it would be constitutionally impermissible for a jury to base its death penalty recommendation [solely] on the victim's class or wealth" and that a victim's "social status is not relevant to the evenhanded administration of justice"). This notion is further supported by the fact that the other ten statutory aggravating circumstances set forth in OCGA § 17-10-30 (b) all appear to require an element in addition to murder of which the defendant, either expressly or impliedly, must have had knowledge.[4]

---

[4] Specifically, the statutory aggravating circumstances (b) (1) and (b) (11) involve a murder committed by a defendant with a prior conviction for a capital felony and for certain specified felonies, respectively. These two aggravating circumstances address the recidivist, who has been put on notice that he will be punished more harshly for subsequent offenses. The (b) (2) statutory aggravating circumstance involves the offense of murder during the commission of specified felonies and thus clearly requires an additional culpable mental state in the form of the felonious intent to kidnap, rob, rape, or the like. The (b) (3) statutory aggravating circumstance, "*knowingly* creat[ing] a great risk of death . . ." on its face requires knowledge. The (b) (4) statutory aggravating circumstance, committing the offense of murder *for the purpose* of receiving money, likewise, expressly involves intent. The (b) (5) statutory aggravating circumstance involves the murder of certain officers of the court "during or because of the exercise of [their] official duties." The phrase "because of the exercise of . . . official duties" requires that the perpetrator know that the victim is the designated officer of the court and is performing an official act at the time of the murder. Although "during . . . the exercise of . . . official duties" is not as clear, given the nature of the duties of the officers of the court designated in the code section and the fact that they often perform their duties in the courtroom where their positions would be apparent, this statutory aggravating circumstance also appears to involve the element of knowledge. The (b) (6) aggravating circumstance is murder for profit or for hire, which on its face involves criminal intent. To establish the (b) (7) aggravating circumstance, the State must prove both that the murder was outrageously or wantonly vile, horrible, or inhuman and that it involved some element of malice or intent evidenced through torture, depravity of mind, or aggravated battery to the victim. See *West v. State*, 252 Ga. 156, 161-162 (313 SE2d 67) (1984). Finally, the (b) (9) and (b) (10) aggravating circumstances involve murders committed to avoid a lawful arrest or by a person who has

Thus, contrary to the majority's suggestion that inferring a knowledge element in the (b) (8) statutory aggravating circumstance would be tantamount to a " 'usurp[ation of] the legislature's role,' " see Maj. Op. at 169 (quoting *Gibson*, supra, 270 Ga. at 859-860 (1)), my proposed construction merely endeavors to give effect to the legislative purpose of the statutory aggravating circumstances, namely, to sufficiently narrow the applicability of the amended death penalty statute so as to address the constitutional infirmities identified in *Furman*, supra. See *Miller*, supra, 260 Ga. at 673-674 (inferring mens rea requirement in criminal statute so as to insulate it from First Amendment overbreadth challenge). In addition, though the majority decries the possibility under my proposed construction that the death penalty would be precluded in cases involving the murder of undercover officers or officials enforcing an unpopular law, it makes no effort to explain why such crimes inherently suggest more culpability than any other murder so as to warrant the penalty of death.[5] I cannot conclude that, without a victim status scienter element, the (b) (8) statutory aggravating circumstance provides a "principled way to distinguish" between cases deserving of the death penalty and other murder cases. *Godfrey v. Georgia*, 446 U. S. 420, 433 (100 SC 1759, 64 LE2d 398) (1980).

Finally, but no less significantly,

> [i]t has always been the law that criminal statutes must be strictly construed against the state . . . [and that], where a statute imposing the penalty for commission of a criminal offense is capable of two constructions, such statute should be construed as imposing the lesser penalty.

(Citations and punctuation omitted.) *Bankston v. State*, 258 Ga. 188, 190 (367 SE2d 36) (1988). Even accepting arguendo the majority's conclusion that the mere omission of the word "knowingly" is dispositive proof of the Legislature's intent not to require victim status scienter in OCGA § 17-10-30 (b) (8), it is difficult to contend that the statute could not reasonably be construed in the manner I propose. The fact of these plausible alternative constructions should

---

escaped from the lawful custody of a peace officer or lawful place of confinement, both of which plainly involve criminal intent.

[5] I note also that adoption of the majority's position would give rise to the anomalous result that the more serious crime of murdering a peace officer with the possible punishment of life without parole or death would not require knowledge of the victim's status, whereas the less serious crimes of aggravated assault on a peace officer and aggravated battery on a peace officer would require such knowledge of the victim's status. See *Stacey v. Caldwell*, 186 Ga. App. 293, 295 (1) (367 SE2d 73) (1988) (stating that courts should not so construe a statute as will result in unreasonable consequences not contemplated by the Legislature).

be sufficient in and of itself to persuade this Court to err on the side of caution, particularly where the Court's determination may well mean the difference between life and death.

For the foregoing reasons, I respectfully dissent to the majority's holding in Division 2 (b).

I am authorized to state that Chief Justice Sears joins in this concurrence in part and dissent in part.

DECIDED JULY 14, 2008.

*Jeffrey L. Grube*, for appellant (case no. S08A0427).

*Howard Z. Simms, District Attorney, Graham A. Thorpe, Kimberly S. Schwartz, Laura J. Murphree, Thurbert E. Baker, Attorney General, Sabrina D. Graham, Assistant Attorney General*, for appellee.