**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**June 8, 2012**

# In the Court of Appeals of Georgia

A12A0070. CONRAD et al. v. THE STATE.

PHIPPS, Presiding Judge.

George Conrad and Joseph William Presnal were charged with violating the Georgia Controlled Substances Act[1] after drugs were discovered in each of their bedrooms during the execution of a search warrant. Conrad and Presnal moved to suppress the drug evidence. They contended that, given the inner partitioning of the residential structure, the warrant and the search failed to comply with the Fourth Amendment. The trial court conducted a hearing, summarily denied their motion, then proceeded to a stipulated bench trial. Convicted as charged, Conrad and Presnal filed

---

[1] OCGA § 16-13-20 et seq.

a joint notice of appeal.[2] They challenge the denial of their suppression motion, but

have demonstrated no error. We affirm their judgments of conviction.

"In a ruling on a motion to suppress, a trial court's findings as to disputed facts

will be reviewed under a clearly erroneous standard and the trial court's application

of the law to undisputed facts is subject to de novo appellate review."[3]

Construed to support the judgment,[4] the evidence adduced at the suppression

hearing and the bench trial showed the following.[5] After receiving reports that Presnal

was selling illegal drugs in a particular area, a special agent of a police department's

narcotics unit launched an investigation, including conducting several "trash pulls"[6]

---

[2] OCGA § 5-6-44 (a) (allowing for joint appeals).

[3] *Canty v. State*, 286 Ga. 608 (690 SE2d 609) (2010) (citation and punctuation omitted).

[4] See *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994) (a guiding principle for a court reviewing a suppression ruling is that evidence must be construed most favorably to the upholding of the trial court's findings and judgment); see also *Miller v. State*, 288 Ga. 286-289 (1) (702 SE2d 888) (2010) (reaffirming *Tate*, supra).

[5] See *White v. State*, 263 Ga. 94, 98 (5) (428 SE2d 789) (1993) (suppression hearing transcript and trial transcript may be considered on review of suppression ruling); *Arnold v. State*, 304 Ga. App. 90, n. 2 (695 SE2d 402) (2010) (same).

[6] The special agent explained that a "trash pull" is retrieving trash after it has been abandoned by the resident(s) – e.g., the trash has been "put . . . out for a professional sanitation company to pick up" – and then searching through the trash for signs of narcotics or sales of narcotics.

at Presnal's residence, which had a street address of "53 West James Circle." Each "trash pull" yielded narcotics and related paraphernalia. Based upon his training and experience, along with the drug reports and the totality of his investigation thereof, the special agent submitted to a magistrate an application, accompanied by his affidavit, for a warrant to search the residence for controlled substances and related paraphernalia. The magistrate issued a warrant to search therefor at "the residence located at 53 West James Circle."

The warrant was executed on July 9, 2010. The dwelling had an outward appearance of a single-family ranch-style house. There was a single mailbox out front, which displayed "53," without any subunit delineation; a single driveway that led to the house; and a single set of adjacent double doors at the sole front entrance. The property was owned by Presnal's mother, who lived there, as did Conrad and Presnal.

The inside of the dwelling was divided by a wall, except that a common area across the front of the house allowed access between the two sides without going outside. There were bedrooms on both sides; one side had a kitchen, and the other side had a kitchenette that appeared to be under renovation.

The common area across the front of the house was described by the special agent: "It was an interior area . . . it appeared that it had been uncovered at one point.

3

It looked like it was an addition, but it was completely enclosed from the exterior and it connected the two sides of the residence." The common area had interior doors leading to either side of the house, and it had a set of adjacent exterior doors that opened to the front yard. Non-adjacent exterior doors were at the back of the residential structure.

Presnal also testified about those two interior doors of the common area: "[T]here's a door on the left side, which if you enter there that's my mother's area. And then there's a door on the right side. If you enter there, that was the area that I was staying in." When asked how he would access his mother's area from his area, Presnal answered, "I would either have to go outside the back and enter in her side of the door or I could go through the front door of mine, cross the [common area] and enter the front door over there on her side."

The residential structure had been Presnal's childhood home, and he confirmed that the enclosed common area "used to be an open porch"; that the two sides of the house had previously carried an address with subunit designations, "A" and "B"; and that there had once been two water meters for the residential structure. But his mother had since made changes, and the property no longer carried subunit designations; by

4

(at least) the date of the search, the property had only one water meter, one mailbox, and even one common garbage can that was used by all the residents.

During the execution of the search warrant, methamphetamine and clorazephate were discovered in Presnal's bedroom. Four hydrocodone ("Lortab") pills were discovered in Conrad's bedroom, which was located – using Presnal's terminology – in "[Presnal's] mother's area" of the house.[7]

In this appeal, Conrad and Presnal continue to challenge the validity of the search warrant, as well as its execution.

1. Conrad and Presnal maintain that the warrant was insufficient in that it failed to satisfy the particularity requirement of the Fourth Amendment, which requires that the warrant "particularly describ[e] the place to be searched." Conrad and Presnal characterize the residential structure as a "duplex," thus comprised of subunits. Because the warrant did not specifically grant permission to search any particular subunit, but instead described the place to be searched as "the residence located at 53 West James Circle," Conrad and Presnal argue that the warrant was not sufficiently particular.

_____

[7] The record does not disclose the relationship between Conrad and either Presnal or Presnal's mother.

5

The test for evaluating the particularity of a warrant's premises description is "whether the description is sufficient to enable a prudent officer executing the warrant to locate [the place to be searched] definitely and with reasonable certainty."[8] "Furthermore, the degree of the description's specificity is flexible and will vary with the circumstances involved."[9] "While a description of the place to be searched must be particular enough to guide the executing officer as to where the warrant is to be executed, there is in addition the requirement that the description be sufficiently narrow in the sense of not outrunning the probable cause showing."[10]

> Under the particularity requirement of the Fourth Amendment,
>
> the general rule is that a search warrant for an apartment house or hotel
> or other multiple-occupancy building will usually be held invalid if it

---

[8] *Fair v. State*, 284 Ga. 165, 170 (3) (a) (664 SE2d 227) (2008) (citation and punctuation omitted); see *Anderson v. State*, 249 Ga. 132, 135 (5) (287 SE2d 195) (1982) (same).

[9] *Fair*, supra (citation and punctuation omitted).

[10] 2 LaFave, Search and Seizure, § 4.5 (a) at p. 578 (4th ed. 2004); see *Maryland v. Garrison*, 480 U. S. 79, 84 (I) (107 SC 1013, 94 LE2d 72) (1987) (explaining that the Fourth Amendment's particularity requirement "ensures that the search will be carefully tailored to its justifications and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit"); see generally *Fair*, supra at 171-172 (3) (b) (evaluating whether there was probable cause that evidence of crime would be found upon the premises specified by the search warrant).

fails to describe the particular subunit to be searched with sufficient definiteness to preclude a search of one or more subunits indiscriminately. There are, however, exceptions to this general rule. "The warrant of a multi-unit structure will be valid where (1) there is probable cause to search each unit; (2) the targets of the investigation have access to the entire structure; or (3) the officers reasonably believed that the premises had only a single unit."[11]

In this case, the first and second exceptions are applicable.

In determining if probable cause exists to issue a search warrant, a magistrate must evaluate all the circumstances set forth in the affidavit before him or her and make a practical, common-sense decision whether there is a fair probability that evidence of a crime will be found in a particular place. On review, this Court is limited to determining if the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant, and must afford substantial deference to the magistrate's decision.[12]

---

[11] *Fletcher v. State*, 284 Ga. 653, 655 (3) (670 SE2d 411) (2008), quoting *United States v. Perez*, 484 F3d 735, 741 (4) (5th Cir. 2007) (noting also that "[w]hen a building is divided into more than one residential unit, a distinct probable cause determination must be made for each unit").

[12] *Fletcher*, supra at 655-656 (3) (punctuation and footnotes omitted).

7

"Even doubtful cases should be resolved in favor of upholding a magistrate's determination that a warrant is proper."[13]

The affidavit accompanying the search warrant application informed the magistrate of the following. In April 2010, the narcotics unit had received an anonymous complaint that "Joseph William Presnal" was selling methamphetamine, prescription pills, and cocaine and that "Billy" lived with his parents at the residence with street address "53 West James Circle." That same month, a confidential informant reported to two special agents of the narcotics unit that Presnal sold methamphetamine from that address and that he lived there. Afterward, the investigating special agent consulted various databases and determined that Presnal and others, including Conrad, were current residents at that address.

The affidavit further apprised the magistrate that in May 2010, the special agent found inside a trash can, which he determined had been left for pickup by a professional sanitation company and thus abandoned by its owner(s): "a clear ziploc baggie containing methamphetamine residue; a mango flavored blunt wrapper; an empty clear green ziploc baggie; a torn plastic corner; and a tied plastic sandwich

---

[13] *Sullivan v. State*, 284 Ga. 358, 361 (2) (667 SE2d 32) (2008) (citation omitted).

baggie which was torn open." Later that month, the special agent again found inside the similarly abandoned trash can: "three small baggies containing methamphetamine residue, a 'FW' digital scale, a partially smoked marijuana cigarette, marijuana stems, a plastic sandwich baggie with a torn corner, a torn plastic corner, and two small empty ziploc baggies." In June 2010, the special agent found in the similarly abandoned trash can: "a clear green ziploc baggie containing methamphetamine; a torn plastic corner with white residue; ten small plastic ziploc baggies with methamphetamine residue; five pieces of paper with names and dollar amounts listed (drug ledgers). . . ." In early July 2010, the special agent found in a similarly abandoned trash can: "thirteen small ziploc-style baggies containing methamphetamine residue; three torn plastic baggie corners containing methamphetamine residue; . . . a tied piece of plastic containing marijuana; an open piece of plastic containing a marijuana bud; two empty 'Glass Rose' boxes, which are commonly used to smoke methamphetamine; and numerous empty blunt wrappers, which are commonly used to smoke marijuana."

The affidavit also described the residential structure as "a ranch style home," with a single mailbox and a single driveway. The affidavit informed the magistrate that, because the county tax assessors' records had designated the structure upon the

9

property as a "duplex," the special agent had followed up with additional research. He had spoken to a representative from the county water and sewage authority, who reported that only one water meter was installed at the property. Additionally, the special agent had spoken with a representative from the tax assessors' office, who reported that the property owner had recently submitted a petition requesting that "the two property lots she owns be combined into one." The affidavit stated that, in June 2010, the property owner had informed the office that her residence was a single-family residence, and not a duplex as described in the tax assessors' records. Further, the affidavit stated:

> While describing the interior of the residence to the Tax Assessors Office, [the property owner] advised there is *a mother-in-law suite inside the residence*, but there are no interior separation walls and *it is accessible from the main living area*. Finally, [the property owner] advised that *all areas of the residence are accessible from anywhere else in the residence*.[14]

We conclude that the affidavit provided the magistrate with enough information to come to the "practical, common-sense" conclusion that illicit drugs were being used in and/or sold from the residence located at 53 West James Circle; that Presnal was

---

[14] (Emphasis supplied.)

10

a target of the drug investigation and lived at that location with at least one of his parents; that the residence located at 53 West James Circle contained a mother-in-law suite that was accessible from a common area; that Presnal (and other residents) had access to the entire residential premises; and that there was a fair probability that evidence of drug crimes could be found in either the mother-in-law's suite or the main part of the residential structure. "Because the application for the search warrant established probable cause to search [the mother-in-law's suite, where Presnal's bedroom was located] and [Presnal's mother's side of the house, where Conrad's bedroom was located], we conclude the trial court properly denied [the] motion to suppress the evidence."[15]

---

[15] *Fletcher*, supra at 656 (3); *State v. Capps*, 256 Ga. 14, 15-16 (3) (342 SE2d 676) (1986) (warrant was not invalid for failure to specify which of the two residential units in two-story "single family dwelling" was to be searched; although there were separate kitchen facilities upstairs and downstairs, and the elderly aunt who was the downstairs resident paid separate gas, electric and telephone bills, there was no evidence that the use of the dwelling by any family member, the defendants or the aunt, was restricted to only part of the dwelling); *Bing v. State*, 178 Ga. App. 288, 289-290 (1) (342 SE2d 762) (1986) (physical precedent only) (cited in *Fletcher*, supra).

2. Conrad and Presnal contend that execution of the warrant was unlawful, citing *Jones v. State*[16] and *Miller v. State*[17] for the proposition that probable cause for the issuance of a warrant may disappear if the warrant was issued on information that proves to be materially inaccurate.[18] Conrad and Presnal assert that the affidavit contained "inaccuracies in the structure of the building." In addition, they claim that the "four lortab borrowed from an acquaintance for back pain by occupant/defendant Conrad do not come close to describing the depth of 'drug trafficking' described in the search warrant affidavit."

Conrad and Presnal have misplaced their reliance on *Jones* and *Miller*; the supporting affidavit, detailed in pertinent part above, did not contain material inaccuracies, but adequately took into account the inner partitioning of the residential structure.[19] Furthermore, the drugs underlying Conrad's and Presnal's charges,

---

[16] 126 Ga. App. 841 (192 SE2d 171) (1972).

[17] 126 Ga. App. 847 (191 SE2d 883) (1972).

[18] See *Miller*, supra at 849 (2) ("The total of the inaccuracies between the affidavit and the true state of affairs [was] so material as to go to the integrity of the affidavit and warrant, destroying the probable cause for the search."); *Jones*, supra at 843 (recognizing that, where search warrant was issued based on information that proved to be materially unreliable and inaccurate, "the probable cause for issuance of the warrant disappear[ed]").

[19] See Division 1, supra.

suppression motion, and convictions were discovered in places that the warrant authorized to be searched specifically for controlled substances.[20] Because there is no merit in this contention, the trial court correctly determined that it supplied no ground to suppress the drug evidence.

*Judgments affirmed. Ellington, C. J., and Dillard, J., concur.*

---

[20] See *Teal v. State*, 282 Ga. 319, 322-323 (2) (647 SE2d 15) (2007) (exclusionary rule prohibits introduction into evidence seized during an *unlawful* search).