297 Ga. 222
FINAL COPY

S15A0355. THE STATE v. SUTTON.

THOMPSON, Chief Justice.

The State indicted appellee Jerry Sutton for malice murder in connection with the shooting of his brother-in-law, William Anderson. The trial court subsequently granted appellee's motion to dismiss the indictment, finding that appellee acted in self-defense in shooting Anderson, see OCGA § 16-3-21,[1] and was thus immune from prosecution under OCGA § 16-3-24.2.[2] On appeal, the State asserts that, for several reasons, the trial court erred in granting appellee's

---

[1] OCGA § 16-3-21 says that "a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony."

[2] OCGA § 16-3-24.2 says that

[a] person who uses threats or force in accordance with Code Section 16-3-21, 16-3-23, 16-3-23.1, or 16-3-24 shall be immune from criminal prosecution therefor unless in the use of deadly force, such person utilizes a weapon the carrying or possession of which is unlawful by such person under Part 2 of Article 4 of Chapter 11 of this title.

In this case, appellee was not carrying his weapon unlawfully.

motion to dismiss.  We affirm.

1.  To prevail on his immunity claim, appellee was required to establish his justification defense under OCGA § 16-3-21 by a preponderance of the evidence.  See Sifuentes v. State, 293 Ga. 441, 444 (746 SE2d 127) (2013).  The trial court held a pre-trial hearing on appellee's immunity motion and later entered detailed findings of fact in granting it.  On appeal of an order granting or denying immunity under OCGA § 16-3-24.2, "we review the evidence in the light most favorable to the trial court's ruling, and we accept the trial court's findings with regard to questions of fact and credibility if there is any evidence to support them."  Hipp v. State, 293 Ga. 415, 418 (746 SE2d 95) (2013) (citation and punctuation omitted).

Viewed in the light most favorable to the trial court's ruling, the evidence presented at the hearing showed that, in July 2013, appellee and his sister, Sherry Hardeman, were upset with their sister, Susan Anderson, and her husband, the deceased, for taking money from Virginia Sutton, the mother of the three siblings.  This had been going on for some time, and the mother was in ill-health and suffering from some dementia.  On July 26, appellee spoke with Susan Anderson and told her that her practice of taking money from their

mother had to stop. Later that day, appellee received two threatening voicemails from calls that were made on Susan Anderson's phone. One of the messages was from the deceased. In it, the deceased complained about statements that Sutton had made about him and then screamed into the phone "you know me m. . . . . f. . . . . , I will come up there and g. . d. . . tear you a new ass. . . . ." In the second voicemail, the deceased's stepson, in a profanity-laced call, told appellee that the next time he saw appellee, he "better g. . d. . . be ready."

On July 27, appellee and Sherry Hardeman went to their mother's apartment to see how she was doing. Susan Anderson also stopped by her mother's apartment, and a controversy erupted over whether she was going to get money from her mother. Hardeman and appellee told her she could not get any more, and Susan began screaming and cussing. Appellee called Officer Randy Rigdon and asked him to come to the mother's home. Officer Rigdon did so, and Susan left. The officer listened to the two voicemail messages that appellee received the previous day. Rigdon testified that it was apparent to him that appellee was very concerned for his safety. Officer Rigdon added that the mother told him that she did not want the deceased to come to her home. Later that day, Rigdon and another officer went by the deceased's home and conveyed

3

that message to him.

Despite this message, the deceased, Susan Anderson, and Ray Rogers went to Ms. Sutton's home about 8:50 a.m. on Sunday, July 28. According to Rogers, he and the deceased had been drinking beer since about 12:30 a.m., and the group went to the mother's apartment because Susan was "hell bent" on getting money from her mother that morning. Appellee was already at his mother's apartment when the group arrived. He was armed with a handgun, which he had placed on the sofa. Although the later arriving group saw appellee's truck in front of the mother's apartment, Susan Anderson went into the apartment, leaving the door open. She saw appellee's gun on the sofa and said, "we've got one too." Appellee and Susan began arguing. Rogers and the deceased heard the argument, and the deceased jumped out of his truck and ran toward the apartment. Rogers tried to, but could not, catch him before he got to the apartment door. When appellee saw the deceased, he chambered a round into his firearm and repeatedly told the deceased not to come any closer, but the deceased nevertheless "continu[ed] to proceed through the doorway."[3] Appellee

_____

[3] The trial court made a finding of fact to this effect based on a recorded statement that appellee made to a GBI agent. That statement was played at the

4

then fired his weapon once, and the deceased fell into some shrubs by the entrance to the apartment. He died from a gunshot wound to the abdomen. No weapon was found on or near the deceased. A toxicology report showed that the deceased had cocaine in his blood at the time of his death. Meanwhile, forensic testing showed that appellee had no alcohol or drugs in his system when he shot the deceased.

At the time of the shooting, appellee knew of three prior acts of violence committed by the deceased. One of the violent incidents occurred in 1992 and involved a City of Glenwood police officer (appellee was a police officer for Glenwood at that time). The officer was involved in a high-speed automobile chase with the deceased and his brother. The deceased's car eventually became stuck, and the deceased and his brother attacked the officer, striking him in the

hearing but it was not transcribed as it was played and a copy of the recording is not in the appellate record. We therefore must assume that the trial court's finding regarding the recording is correct. See Jenkins v. Edelhertz, 272 Ga. 480, 481 (532 SE2d 94) (2000) (explaining that, when there is no transcript of a hearing presented for appellate review, we must assume that the trial court's findings of fact regarding that hearing are correct); Rodriguez v. State, 295 Ga. 362, 369, n. 11 (761 SE2d 19) (2014) (explaining that, because a video recording was tendered in evidence before the trial court but was not in the record on appeal, we "must assume . . . that the recording supports the decision of the trial court.").

5

head with his radio. The officer then shot the deceased. A second incident occurred when the deceased broke into the home of his estranged wife and attacked her. She, however, was armed with a knife and stabbed him. The third violent act occurred when the deceased, who was armed with a baseball bat, got into a fight with another man who was armed with a machete.[4]

Construing the evidence in the light most favorable to the trial court's

---

[4] Appellant says in its brief that appellee did not properly establish that he had knowledge of these prior acts of violence. See Paul S. Milich, Ga. Rules of Evidence § 11:5 (saying that, when a defendant claims self-defense, his knowledge of the "victim's prior violent acts . . . is admissible as relevant to the defendant's state of mind, apprehension of imminent danger, and the reasonableness of his defensive measures"). The trial court, however, found that appellee knew of the prior acts, and that finding was based on appellee's statement to the GBI agent, which, as noted above, is not in the appellate record. We therefore must assume that the trial court's reliance on the recording was proper. See Jenkins, 272 Ga. at 481; Rodriguez, 295 Ga. at 369, n. 11. Moreover, although appellant filed a motion in limine to keep these prior violent acts from being admitted, the trial court told appellant that it would rule on the admissibility of the prior acts at the time they were offered into evidence at the hearing. Appellant, however, made no objection to any part of appellee's statement to the GBI agent when it was played for the trial court at the hearing. For this additional reason, the trial court properly considered the evidence, even to the extent any part of appellee's statement about the deceased's violent acts was based on hearsay. (The hearing on appellee's immunity motion occurred on May 1, 2014, after the effective of our new Evidence Code, and under it, if "a party does not properly object to hearsay, the objection shall be deemed waived, and the hearsay evidence shall be legal evidence and admissible." OCGA § 24-8-802.)

ruling, we conclude that the trial court did not err in finding that appellee had shown by a preponderance of the evidence that he shot the deceased because he reasonably believed such force was necessary to prevent death or great bodily injury to himself or his mother from the deceased's imminent use of unlawful force. The trial court thus properly ruled that appellee was immune from prosecution.

2. Appellant contends that whether appellee acted in self-defense under the standard of OCGA § 16-3-21 is a question for a jury and that the trial court therefore erred in ruling on appellee's self-defense claim before trial. However, this Court has clearly held that, upon the filing of a motion for immunity, a trial court must determine before trial whether a person is immune from prosecution under OCGA § 16-3-24.2. In this case, therefore, the trial court had to determine before trial whether appellee acted in self-defense according to the standards set forth in OCGA § 16-3-21. See Bunn v. State, 284 Ga. 410, 412-413 (667 SE2d 605) (2008); Fair v. State, 284 Ga. 165, 166 (664 SE2d 227) (2008). Although appellant asks us to overrule Bunn and Fair, we continue to find their reasoning sound and decline to do so.

3. The autopsy report of the GBI medical examiner said that the bullet,

7

from its initial entry into the deceased's abdomen, dropped over eight inches and moved about five inches from right to left before exiting the deceased's body. The trial court found that "this trajectory is consistent with [the deceased] having lunged forward with his right side toward the Defendant." Appellant contends that this finding is not supported by the evidence. We disagree, as the autopsy report is some evidence supporting the finding. See Hipp, 293 Ga. at 418 ("we accept the trial court's findings with regard to questions of fact . . . if there is any evidence to support them" (citation and punctuation omitted)).

Judgment affirmed. All the Justices concur.


Decided June 1, 2015.

Murder. Wheeler Superior Court. Before Judge Wall.

Timothy G. Vaughn, District Attorney, Lauren C. Shurling Finley, Assistant District Attorney; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, for appellant.

Salter, Shook & Tippett, Mitchell M. Shook, Paul W. Calhoun III, for appellee.