In the Supreme Court of Georgia

Decided: November 16, 2015

S15A0764. HAYES v. THE STATE.

HINES, Presiding Justice.

Samuel Johnson Hayes appeals from his convictions and sentences for malice murder, armed robbery, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony, all in connection with the death of Joshua Grier. For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that Grier owed

[1]The crimes occurred on January 22, 2012. On May 15, 2012, a DeKalb County grand jury indicted Hayes for malice murder, felony murder while in the commission of the crime of armed robbery, felony murder while in the commission of the crime of aggravated assault, felony murder while in the commission of the crime of possession of a firearm by a convicted felon, armed robbery, aggravated assault, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony. He was tried before a jury May 6-9, 2013, and found guilty of all charges. On May 9, 2013, Hayes was sentenced as a recidivist to life in prison without the possibility of parole for malice murder, a concurrent term of life in prison without the possibility of parole for armed robbery, a concurrent term of five years in prison for possession of a firearm by a convicted felon, and a consecutive term of five years in prison for possession of a firearm during the commission of a felony; the remaining charges either merged with a crime for which a sentence was entered or were vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-374 (4), (5) (434 SE2d 479) (1993). Hayes filed a motion for new trial on June 6, 2013, which he amended on May 30, 2014; on June 30, 2014, the motion, as amended, was denied. Hayes filed a notice of appeal on July 21, 2014, the appeal was docketed in this Court for the April 2015 term, and orally argued on April 21, 2015.

money to Hayes. During the evening of January 21, 2012, the night before Grier's death, at her home, the sister of Hayes's girlfriend saw Hayes and Jahan Mims with a handgun, and they asked her husband to supply them with another pistol. Early the next morning, Hayes called Grier's cell phone multiple times while Grier was working a night shift at a Waffle House restaurant. Grier did not answer. Eventually, Grier spoke with Hayes and agreed to meet him at a shopping mall after Grier's work shift was over; at the time of this call, Hayes, accompanied by Mims, was in Hayes's vehicle parked outside of a business next to the Waffle House.

When Grier's shift ended at 7:00 a.m., he did not immediately leave the restaurant, but lingered for some time; he appeared nervous, and hugged his co-workers goodbye, which was unusual. Grier left the restaurant and, followed by Hayes and Mims, drove to a shopping mall parking lot where Hayes got into the backseat of Grier's car. At Hayes's direction, Mims drove Hayes's vehicle toward Lake Michelle, in DeKalb County, followed by Hayes and Grier in Grier's car. Mims made a detour to retrieve some clothes from a friend's house, while Hayes and Grier continued on. Mims was unable to complete the errand, and waited for Hayes to call him by cell phone after the other men "finished

2

taking care of business or whatever." Hayes then called Mims and, driving Grier's vehicle, went to Mims's location; Hayes was alone. Mims asked about Grier, and Hayes said that Grier owed him money and that he had to "break him off." Mims then drove Grier's car to the home of the sister of Hayes's girlfriend, following Hayes, who drove his own vehicle. The next day, during an argument with his girlfriend, Hayes was overheard to say that someone was "pushing up daisies" and would not have to be "worr[ied] about anymore."

On the afternoon of January 22, 2012, Grier's body was found by fishermen at Lake Michelle; he had suffered fatal gunshot wounds to his head and neck. Three of his pants pockets had been turned out. At the time of his death, Grier was a parolee and, on one of his ankles, wore a global positioning system ("GPS") device that tracked his location; data generated by the GPS device showed that his movements stopped at 9:22 a.m. on January 22, 2012, at Lake Michelle. That same morning, two men across the lake heard gunshots and saw a man outside a car resembling Grier's; the man entered the car and drove away. Data from cell phone towers indicated that Hayes's movements correlated with Grier's during the morning of Grier's death. Surveillance videos from two convenience stores on the route from the shopping mall to Lake

3

Michelle showed two vehicles matching the description of Hayes's and Grier's passing the stores, apparently traveling in tandem. Grier's vehicle was found burned three days after Grier's death.

1. The evidence authorized the jury to find Hayes guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Hayes contends that his trial counsel failed to provide effective representation in several respects. In order to prevail on these claims, he must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong of the test, he must show that there is a reasonable

probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. Id. at 783. "'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

(a) At the State's request, the trial court instructed the jury on the law of conspiracy, and trial counsel did not object. Although Hayes contends that counsel should have made an objection, it would have been unavailing. It is not error for the trial court to charge the jury on the law of conspiracy when the evidence introduced at trial supports the instruction, even when the defendant is not indicted for conspiracy. *Belsar v. State*, 276 Ga. 261, 262 (577 SE2d 569) (2003). Contrary to Hayes's contention, for a jury charge on conspiracy to be given, there is no prerequisite that the defendant must have been arrested with another person, or that another person be present with the defendant at the time the crime is completed; evidence of an agreement to commit a crime, which can be shown by evidence of a common design as well as an express agreement, will support the giving of a jury charge on the law of conspiracy. See *Crawford v. State*, 294 Ga. 898, 902-903 (2), (3) (757 SE2d

5

102) (2014). And, although no witness testified directly to the existence of a conspiracy, evidence was introduced that supported the inference that Hayes acted with Mims in a common design to rob and kill Grier. Indeed, evidence linking Mims to the crimes was important to the defense theory that it was Mims who was responsible for killing Grier, and trial counsel correctly recognized that a conspiracy charge was warranted and that there was no basis to object to it. Accordingly, it was not ineffective assistance of counsel to fail to object to the charge. See *Martin v. State*, 281 Ga. 778, 781 (3) (a) (642 SE2d 837) (2007).

(b) Hayes contends that trial counsel should have objected when the State introduced evidence of Grier's cell phone calls, texts, and the location of the associated cell phone towers, without the testimony of the custodian of those records. As Hayes recognizes, under the exception to the hearsay rule for records of regularly conducted business activity, record evidence may be admitted without the custodian's in-court testimony if compliance with the requirements of that exception is shown "by certification that complies with

paragraph (11) or (12) of Code Section 24-9-902 . . . ." OCGA § 24-8-803 (6).[2]

Hayes argues that an objection would have been properly sustained on the ground that the certification that accompanied those records was not notarized or signed under penalty of perjury. However, he points to no authority in Georgia law that imposes such a requirement in order to satisfy the certification provision of OCGA § 24-8-803 (6).

By its own terms, OCGA § 24-8-803 (6) does not require that the submitted certification be notarized or signed under penalty of perjury. Rather,

---

[2] OCGA § 24-8-803 reads in pertinent part:

The following shall not be excluded by the hearsay rule, even though the declarant is available as a witness:

. . .

**(6) Records of regularly conducted activity.** Unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness and subject to the provisions of Chapter 7 of this title, a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, if (A) made at or near the time of the described acts, events, conditions, opinions, or diagnoses; (B) made by, or from information transmitted by, a person with personal knowledge and a business duty to report; (C) kept in the course of a regularly conducted business activity; and (D) it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with paragraph (11) or (12) of Code Section 24-9-902 or by any other statute permitting certification. The term "business" as used in this paragraph includes any business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. Public records and reports shall be admissible under paragraph (8) of this Code section and shall not be admissible under this paragraph[.]

7

it looks to OCGA § 24-9-902 (11) and (12),[3] and declares that the certification

---

[3] OCGA § 24-9-902 reads in pertinent part:

Extrinsic evidence of authenticity as a condition precedent to admissibility shall not be required with respect to the following:

. . .

(11) The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under paragraph (6) of Code Section 24-8-803 if accompanied by a written declaration of its custodian or other qualified person certifying that the record:

> (A) Was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of such matters;

> (B) Was kept in the course of the regularly conducted activity; and

> (C) Was made by the regularly conducted activity as a regular practice.

A party intending to offer a record into evidence under this paragraph shall provide written notice of such intention to all adverse parties and shall make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge such record and declaration; or

(12) In a civil proceeding, the original or a duplicate of a foreign record of regularly conducted activity that would be admissible under paragraph (6) of Code Section 24-8-803 if accompanied by a written declaration by its custodian or other qualified person certifying that the record:

> (A) Was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

> (B) Was kept in the course of the regularly conducted activity; and

> (C) Was made by the regularly conducted activity as a regular practice.

The declaration shall be signed in a manner that, if falsely made, would subject the maker to criminal penalty under the laws of the country where the declaration is signed. A party intending to offer a record into evidence under this paragraph shall provide written notice of such intention to all adverse parties and shall make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party

8

must meet the strictures of one of those subsections. And, as the trial court noted, the subsection specifically applicable, OCGA § 24-9-902 (11), places no such requirement on a certificate of authenticity. Nonetheless, Hayes contends that such a requirement should be read into this State's new Evidence Code, asserting that evidence tendered under the similar Federal Rule of Evidence 803 (6)[4] would require that the certification be notarized or signed under penalty of perjury. It is certainly true that

with a fair opportunity to challenge such record and declaration.

[4] Fed.R.Evid. 803 reads in pertinent part:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
. . .

**(6) Records of a Regularly Conducted Activity**. A record of an act, event, condition, opinion, or diagnosis if:

**(A)** the record was made at or near the time by--or from information transmitted by--someone with knowledge;

**(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

**(C)** making the record was a regular practice of that activity;

**(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

**(E)** the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

9

[i]n 2011, our General Assembly enacted a new Evidence Code, of which [OCGA § 24-8-803] is a part. Many provisions of the new Evidence Code were borrowed from the Federal Rules of Evidence, and when our courts consider the meaning of these provisions, they look to decisions of the federal appeals courts construing and applying the Federal Rules, especially the decisions of the Eleventh Circuit.

*State v. Frost*, 297 Ga. 296, 299 (773 SE2d 70) (2015).  However,

[w]here a provision of the new Evidence Code *differs* in substance from the counterpart federal rule, as interpreted by federal courts, we must correspondingly presume that the General Assembly meant the Georgia provision to be different.

*Parker v. State*, 296 Ga. 586, 592 (3) (a) (769 SE2d 329) (2015) (Footnote omitted.)   And here, the provisions differ.

Just as OCGA § 24-8-803 (6) refers to specific provisions governing authenticating records found in OCGA § 24-9-902 (11) and (12), so too does Fed.R.Evid. 803 (6) look to a corresponding Federal Rule governing record authentication, specifying Fed.R.Evid. 902 (11) and (12).[5]   But, the provisions

---

[5]  Fed.R.Evid. 902 reads in pertinent part:

The following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted:

. . .

**(11)** Certified Domestic Records of a Regularly Conducted Activity. The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a

referred to carry significant differences.  The Federal provision, Fed.R.Evid.

902(11), specifies that compliance with the requirements of Fed.R.Evid. 803(6)

be  "shown by a certification of the custodian or another qualified person that

complies with a *federal statute* or a rule prescribed by the Supreme Court."

(Emphasis supplied.)  No such language is found in OCGA § 24-9-902 (11).

Although Hayes notes that a separate Federal statute, 28 U.S.C.A. § 1746,[6]

certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record--and must make the record and certification available for inspection--so that the party has a fair opportunity to challenge them.

**(12)** Certified Foreign Records of a Regularly Conducted Activity. In a civil case, the original or a copy of a foreign record that meets the requirements of Rule 902(11), modified as follows: the certification, rather than complying with a federal statute or Supreme Court rule, must be signed in a manner that, if falsely made, would subject the maker to a criminal penalty in the country where the certification is signed. The proponent must also meet the notice requirements of Rule 902(11).

[6] 28 U.S.C.A. § 1746 reads:

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

(1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).

11

would require that a certification such as the one at issue be signed under penalty of perjury in a Federal court, not only does OCGA § 24-9-902 (11) have no reference to any such Georgia statute outside the Evidence Code, Hayes does not cite to any Georgia statutory provision that resembles 28 U.S.C.A. § 1746, and we find none. As the Federal and State provisions differ, we must presume that the General Assembly meant that the certificate of authenticity required through the operation of OCGA §§ 24-8-803(6) and 24-9-902(11), need not be notarized or signed under a penalty of perjury. *Parker*, supra. This conclusion is strengthened by the fact that OCGA § 24-9-902 (12), enacted simultaneously with OCGA § 24-9-902 (11), and pertaining to foreign records in civil proceedings, specifically includes the requirement that the certification be notarized or signed under penalty of perjury. Thus, it is clear that the General Assembly knew how to create such a requirement, and chose not to. See *Fair v. State*, 284 Ga. 165, 168 (2) (b) (664 SE2d 227) (2008). Accordingly, as the objection Hayes now asserts that trial counsel should have made has no basis in existing law, failure to make the objection cannot serve as a basis for a claim of

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

ineffective assistance of counsel. See *Williams v. Rudolph*, 297 Ga. ___ (___

SE2d ___) (2015) (Case no. S15A1041, decided Sept. 14, 2015); *Perera v.*

*State*, 295 Ga. 880, 885–886 (3) (d) (763 SE2d 687) (2014).

(c) The State introduced a computer printout of GPS data recorded from

Grier's ankle monitor during the hours before and after his death,[7] and it was

admitted without objection. Hayes contends that trial counsel should have

objected to the printout on the ground that it did not fall under the business

record exception to the hearsay rule found in OCGA § 24-8-803 (6), and that,

if an objection had been made on that basis, the printout would have been

excluded for failure to meet the requirements of OCGA § 24-8-803 (6) as there

was no testimony of any representative of the company that maintained the GPS

database.[8]

The printout was introduced during the testimony of Grier's parole

supervisor. The trial court noted in its order denying the motion for new trial

---

[7] The monitor was on Grier's ankle when his body was found.

[8] For the purposes of addressing the claim of ineffective assistance of counsel that Hayes presents, we need not determine whether the printout at issue falls under the business record exception of OCGA § 24-8-803(6), or whether it was a public record, specifically excluded from the ambit of OCGA § 24-8-803(6); Hayes simply failed to establish the claim of ineffective assistance of counsel that he presented in his motion for new trial.

13

that OCGA § 24-8-803(6) allows the requirements of that Code subsection to be "shown by the testimony of the custodian or other qualified witness," and concluded that the parole supervisor was such a witness. The witness testified to the manner in which the GPS data was gathered and made accessible to him, and to his use of the software provided by the GPS monitoring company. Hayes asserts that the witness's testimony failed to establish a complete foundation for the printout, and should have prompted an objection.

As the trial court noted in its order, trial counsel testified at the hearing on the motion for new trial that, as a tactical decision, she would often refrain from objecting to a procedural problem that could be readily cured. "The matter of when and how to raise objections is generally a matter of trial strategy." *Gibson v. State*, 272 Ga. 801, 804 (4) (537 SE2d 72) (2000). And, refraining from objecting to foundational matters that can be readily cured is not an unreasonable strategy. *Wallace v. State*, 296 Ga. 388, 393 (4) (d) (768 SE2d 480) (2015). Hayes speculates that, had trial counsel objected, the witness would have been unable to lay a proper foundation; he also speculates that no other witness could readily have been procured to establish a proper foundation. But, speculation is insufficient; on his motion for new trial, Hayes had the

14

burden to show that the strategy pursued by trial counsel was unreasonable, and that had trial counsel pursued the strategy appellate counsel now advocates, the result of his trial would have been different. *Smith*, supra. Hayes did not produce any evidence that the witness who was questioned about the exhibit would have been unable to correct any deficiency in the foundation respecting the computer printout, or that another witness could not be readily procured to do so, and thus fails to establish either prong of the required test for ineffective assistance of counsel. *Wallace*, supra.

(d) Finally, in his motion for new trial, Hayes contended that trial counsel should have moved to suppress all evidence procured through the search warrant regarding Hayes's home and vehicle, on the basis that the search warrant was invalid on its face as made without "oath or affirmation," and was issued after the search had occurred. However,

> "'[w]hen trial counsel's failure to file a motion to suppress is the basis for a claim of ineffective assistance, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion.'" *Biggs v. State*, 281 Ga. 627, 631–632 (642 SE2d 74) (2007) (citation omitted).

*Williams v. State*, 290 Ga. 533, 535 (2) (a) (722 SE2d 847) (2012). Hayes has not caused the warrant to be placed in the record on appeal, and does not show

that the trial court erred in determining that the search warrant had been properly sworn to before the issuing judge and that there was thus no basis for any objection.[9] Accordingly, Hayes fails to meet his burden to show error. Id. See also *State v. Sutton*, 297 Ga. 222, 223 (fn. 3) (773 SE2d 222) (2015).

Judgments affirmed.  All the Justices concur.

---

[9] In his brief in this Court, Hayes abandons any claim that the warrant was issued after the search, conceding that the apparent discrepancy in times that he had alleged was a scrivener's error.