301 Ga. 767
FINAL COPY

S17A1175.  STUCKEY v. THE STATE.

NAHMIAS, Justice.

Appellant Dominique Javonte Stuckey was convicted of malice murder and first-degree arson after he killed his grandmother, Velma Stuckey, and set her and her house on fire.  In this appeal, he claims that his trial counsel provided ineffective assistance in four ways.  None of those claims has merit, and we affirm.[1]

1.     Viewed in the light most favorable to the verdicts, the evidence at trial showed the following.  The crimes occurred on March 29, 2009.  Appellant, who was then 15 years old, had been living with his grandmother in

---

[1] On October 2, 2009, a Douglas County grand jury indicted Appellant for malice murder and arson in the first degree.  At a trial from November 29 to December 3, 2010, the jury found Appellant guilty of both charges.  On January 26, 2011, the trial court sentenced him to serve life in prison for the murder and a consecutive term of 20 years for the arson. Appellant filed a timely motion for a new trial, which he amended on September 5, 2012, and then amended with new counsel on June 6, 2016.  After an evidentiary hearing, the trial court denied the motion on July 19, 2016.  Appellant filed a timely notice of appeal, and the case was docketed in this Court for the April 2017 term and orally argued on June 20, 2017.

Douglasville for two or three years after being kicked out of the homes of several other family members for being homosexual. Although she allowed Appellant to live with her, his grandmother did not approve of his sexual orientation or behavior. She was particularly upset by his online interactions with other gay men, many of whom were older than Appellant. He communicated on different online chat rooms and social media outlets, including MySpace, Black Gay Chat, and Yahoo instant messenger. He also communicated by text message with some of the men that he met online; he exchanged sexually explicit photographs with them, participated in sexual conversations, and arranged to meet some of them in person to have sex.

Appellant often told his friends and online acquaintances about his difficulties with his grandmother. A few months before the murder, Appellant asked his cousins, "I wonder how you could kill somebody and get away with it?" About a month before the murder, Appellant sent a text message to his cousin saying that his grandmother made him sick and that he could kill her because she was going to kick him out of the house. Two days before the murder, Appellant sent a series of text messages to various people saying that his grandmother was kicking him out.

The night before the murder, Appellant was discussing sexual activity on Black Gay Chat with a college student. As their communications continued into the early morning hours, Appellant and the student made plans to meet to have sex. Around 5:30 a.m., Appellant searched for directions to the student's house in Carrollton and began getting ready for their rendezvous. Appellant took his grandmother's SUV and told the student that he had to return the car before his grandmother woke up. As Appellant drove to the student's home, he became lost and did not have enough time to make it there and back before his grandmother woke up. Appellant sent a text message to the student informing him of this problem and then began to return home.

On the way home, Appellant stopped at a convenience store to ask for directions at about 8:00 a.m. The store clerk wrote down directions for Appellant, and noticed that he seemed very nervous. Around 8:30 a.m., Appellant stopped at a gas station about eight minutes from his home and pumped a dollar's worth of gasoline into a gas can; he then drove off.

At 9:03 a.m., Appellant called 911 to report that when he returned to his grandmother's house, it was on fire with his grandmother and two dogs trapped inside. He claimed that someone had broken into the house because the front

3

door was open and his television was missing. Appellant then called his cousins to let them know about the fire. He told them that he climbed through his window to get into the house and tried to go upstairs to save his grandmother, but he could not because the ceiling was falling in on him. Appellant also called a friend and gave inconsistent stories about the fire.[2]

When firefighters arrived, there was a lot of smoke coming from the left corner of the house. The front door was locked and all of the ground floor windows were closed, as was Appellant's basement bedroom window. Firefighters entered the home through the unlocked basement door. Firefighter Mike Shadix made his way to the corner of the house where Appellant said his grandmother was trapped and where the fire and smoke were concentrated. However, there were no flames coming through the roof or out of the building; the ceiling was not falling. The throw rug, door casings, and carpet in the grandmother's bedroom were on fire, and Shadix's ability to see was limited as he entered the bedroom from the hallway. He found the victim's body lying on

---

[2] First he told his friend that he and his grandmother had argued after he stole her vehicle to sneak out with his boyfriend. Then he said that an argument began when the grandmother said she was kicking him out of the house because he was gay and wanted a "gay birthday party." Finally, Appellant said that his boyfriend came up with the idea to kill his grandmother and he agreed because he loved his boyfriend so much.

4

the bedroom floor. She was dead, having been burned to the point where she felt "crunchy."

After the fire was put out and the smoke cleared, Shadix observed that the bed coverings were coated in blood and were scattered on the floor under the victim's body. In addition to being burned, the victim had been repeatedly hit and stabbed; she had multiple blunt force injuries to her head and lacerations on her scalp, mouth, and face, including one stab wound to her open left eye. Cast-off blood stains on the headboard and on the wall behind the bed indicated that the stabbing happened while the victim was lying in bed. The head from a garden hoe was found covered in blood under the victim's body after she was moved. This object was consistent with her injuries, and the blood was later determined to be hers. A forensic toxicologist found that the victim had extremely high levels of carbon monoxide in her blood, as well as burns, soot, and smoke in her airway, meaning that she was alive and breathing (although likely unconscious) for some time after the fire was set. The medical examiner concluded that the victim's cause of death was blunt force injuries to the head along with smoke and soot inhalation.

Based upon the burns and smoke patterns in the house, an arson

investigator determined that an ignitable liquid was poured around the victim's body after she was lying on the bedroom floor; the liquid was also poured on the bed and out the bedroom doorway into the hallway. The liquid was then ignited in the hallway. The investigator concluded that the fire was started intentionally to conceal a crime. The victim's SUV, which Appellant had been driving, was parked in the driveway instead of the garage where it was usually kept, and police officers who came to the scene said that the SUV smelled of gasoline and citrus cleaning solution. Carpet samples from the interior of the vehicle were taken and tested positive for the presence of gasoline.

Two weeks after the murder, a gas can and a clear plastic bed comforter bag were found in the woods near the house. The bag contained a Lysol can, a lighter, a woman's scarf and jacket, and jewelry that matched items from the victim's jewelry box found inside her home. Three items from the bag tested positive for the presence of gasoline. Appellant's computer, which was seized and searched, had a deleted file containing internet searches for "how+to+kill+someone" and "how+to+kill+someone without getting caught."

After Appellant was arrested on September 9, 2009, he gave two statements to investigators that were admitted at trial. He initially denied any

involvement in his grandmother's death and the house fire. Eventually, however, Appellant admitted that he was responsible for the fire but claimed that his older boyfriend attacked his grandmother with the garden hoe. Appellant said that he believed his grandmother was dead after the attack, so he left the house to create an alibi with the student in Carrollton. On his return after getting lost, he tried to cover up the attack by staging the house to look like it was burglarized, setting everything on fire, and then calling 911. Appellant did not testify at trial; his defense was based on his final statement.

The alleged boyfriend testified for the State that he was introduced to Appellant by a mutual friend. They had kissed but never had a relationship beyond that. He did not want to be around Appellant and tried to distance himself, but Appellant did not take this well and kept trying to reach out. On the day of the murder, Appellant sent the boyfriend a text message that said his house was on fire and his grandmother was trapped inside. The boyfriend denied any involvement in the crimes.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record, and we conclude that the

evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. Appellant contends that his trial counsel provided ineffective assistance in four ways. To prevail on these claims, Appellant has the burden of proving both that the performance of his lawyer was professionally deficient and that he was prejudiced as a result. See Strickland v. Washington, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, Appellant must show that his trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms. See Lupoe v. State, 300 Ga. 233, 239-240 (794 SE2d 67) (2016). To prove resulting prejudice, Appellant must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. Id. at 240. "[I]n examining an ineffectiveness claim, a court

need not 'address both components of the inquiry if the defendant makes an insufficient showing on one.'" Id. (citing Strickland, 466 U. S. at 697). Appellant's burden is a heavy one, see id., and he cannot meet it with regard to any of his claims.

(a) Appellant contends first that his trial counsel was ineffective in not challenging the authenticity of a 400-page printout of his MySpace account, which was composed mainly of sexually provocative photographs Appellant had taken of himself and his captions and others' comments on those photos. At the motion for new trial hearing, trial counsel testified that she and the prosecutor had entered into an agreement that either party could introduce electronic communications into evidence without bringing in the foundational witnesses. At trial, the prosecutor had advised the court of that stipulation and represented that the State could provide such witnesses if necessary. Appellant has failed to show that his counsel performed deficiently in making this agreement or that a foundation objection would have prevented the evidence from being admitted. See Wallace v. State, 296 Ga. 388, 393 (768 SE2d 480) (2015). See also Hayes v. State, 298 Ga. 98, 105 (779 SE2d 609) (2015) ("[R]efraining from objecting to foundational matters that can be readily cured is not an unreasonable

strategy.").

(b)     Appellant also argues that his trial counsel should have objected to the admissibility of the MySpace printout on the ground that it was not relevant and was overly prejudicial. Trial counsel explained that she did not object to the MySpace photos because they supported her strategy of showing that Appellant was looking for someone who cared for and accepted him, and thus he became involved with older men who took advantage of him — like the boyfriend on whom he blamed the murder. In fact, trial counsel mentioned some of the MySpace photos in her closing argument, while the prosecutor made no mention of the printout in his closing. Trial counsel also testified that she did not find the comments on the photos to be prejudicial to Appellant because they were mainly written by other people. Considering all of the circumstances of this difficult case, we cannot say that trial counsel's strategic decision was unreasonable, so Appellant has not shown deficient performance. See McLean v. State, 297 Ga. 81, 85 (772 SE2d 685) (2015).

Moreover, even assuming that an objection to some of the MySpace printout would have succeeded, Appellant has not shown a reasonable probability that its admission affected the result of his trial. Although the entire

printout was admitted into evidence, only about six photos were shown to the jury during the trial, and there was substantial other evidence of Appellant's lifestyle. And the other evidence that Appellant committed the crimes was overwhelming, including his admission that he set the fire, which the medical evidence showed was one of the causes of the victim's death. See Sullivan v. State, 301 Ga. 37, 42 (799 SE2d 163) (2017).

(c) Appellant asserts next that his trial counsel was ineffective in not objecting to the admission of certain photographs of the victim's body. Although Appellant claims that these photographs were duplicative, the testimony accompanying the admission of each one shows that they were in fact different views of the victim's injuries and were each relevant to some point of the testimony. Trial counsel testified at the motion for new trial hearing that she did not object to these photographs because she did not want to bring more attention to them and had no meritorious basis for objecting. This was reasonable strategy and reflected a correct understanding of the applicable law.

All but two of the photographs in question were taken at the crime scene or before the victim's autopsy incisions. Under Georgia's old Evidence Code, which was in effect at the time this case was tried, pre-autopsy incision

photographs like these, which "showed different angles of the scene, the position of the victim's body . . . , and the nature, location, and extent of the victim's wounds," were admissible, even if they were graphic and somewhat duplicative. Wilcher v. State, 291 Ga. 613, 614 (732 SE2d 81) (2012). The remaining two photographs, which were taken after some autopsy incisions had been made, were admissible to show that the victim had smoke and soot in her trachea, which was directly relevant to the medical examiner's testimony regarding the cause of death. See Banks v. State, 281 Ga. 678, 680-681 (642 SE2d 679) (2007) (explaining that post-incision autopsy photographs are admissible when they show internal injuries). Failure to make a meritless objection cannot be considered deficient or prejudicial. See Moss v. State, 298 Ga. 613, 617 (783 SE2d 652) (2016).

(d) Finally, Appellant contends that his trial counsel was ineffective in not objecting to the admission of five photographs of the victim in life, some depicting her with family members other than Appellant, and to her son's identification of her in those photos. Pretermitting whether some or all of these photos would have been excluded upon objection and whether not objecting was part of trial counsel's reasonable strategy, we conclude that Appellant cannot

demonstrate prejudice in light of the overwhelming evidence of his guilt. See Sullivan, 301 Ga. at 42. This Court has emphasized that when the State seeks to admit a photograph of a murder victim in life, it should make every effort to proffer a photograph of the victim alone and to have someone other than a family member identify the victim. See Haynes v. State, 287 Ga. 202, 204 (695 SE2d 219) (2010); Flowers v. State, 275 Ga. 592, 594 (571 SE2d 381) (2002). See also Ragan v. State, 299 Ga. 828, 832-833 (792 SE2d 342) (2016) (decided under the new Evidence Code). Nevertheless, in this case the jury was aware from other evidence that the victim was a grandmother with family beyond Appellant, and the record indicates no overly emotional reaction to the photos by the victim's son or others in the courtroom. There is no reasonable probability that Appellant would have seen a more favorable outcome at trial if some or all of these photos had been excluded. Thus, this claim of ineffective assistance of trial counsel, like Appellant's other claims, lacks merit.

Judgment affirmed. All the Justices concur.

Decided August 14, 2017.

Murder. Douglas Superior Court. Before Judge James.

Christy E. Draper, for appellant.

Brian K. Fortner, District Attorney, Emily K. Richardson, Rachel D. Ackley, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General, for appellee.