321 Ga. 292
FINAL COPY

S25A0204. THE STATE v. HYLTON.

Boggs, Chief Justice.

Appellee Shawn Hylton was indicted for felony murder and other crimes in connection with the shooting death of Lathan Davenport.[1] Prior to trial, Hylton filed a motion for immunity from prosecution under OCGA § 16-3-24.2, which the trial court granted. On appeal, the State contends that the trial court's order granting the motion lacked sufficient findings of fact and conclusions of law to permit meaningful appellate review. It also argues that the evidence showed that Hylton was not at risk of death or great bodily harm when he shot Davenport, such that deadly force was not

_____

[1] The shooting occurred on July 23, 2023. On December 19, 2023, a DeKalb County grand jury indicted Hylton for felony murder (Count 1), aggravated assault (Count 2), and possession of a firearm during the commission of a felony (Count 3). On March 12, 2024, Hylton filed a motion for a hearing on immunity from prosecution under OCGA § 16-3-24.2. After an evidentiary hearing on July 2, 2024, the trial court entered an order granting the motion on July 10, 2024. The State filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2024 and submitted for a decision on the briefs.

necessary to prevent an attack, and immunity was not warranted under OCGA § 16-3-24.2. For the reasons set forth below, we affirm.

1. Viewed in the light most favorable to the trial court's ruling, the evidence presented at the immunity hearing showed the following.[2] Hylton and Davenport were both homeless and lived in vehicles that were parked near a mechanic shop owned by Terry Ferguson in Stone Mountain. On July 23, 2023, Hylton walked to Ferguson's shop to get Ferguson's help with fixing Hylton's moped, which Hylton had previously parked a short distance away from the shop. Ferguson arrived a few hours after Hylton and took an initial look at the moped to determine what tools would be required to repair it. Ferguson then walked back to the shop, which was about a 15- to 16-second walk from where the moped was parked, got the tools, and brought them to Hylton. Ferguson briefly helped Hylton and then walked back to the shop while Hylton continued to repair

_____

[2] See *State v. Remy*, 308 Ga. 296, 298 (840 SE2d 385) (2020) ("On appeal of an order granting or denying immunity, we review the evidence in the light most favorable to the trial court's ruling, and we accept the trial court's findings with regard to questions of fact and credibility if there is any evidence to support them." (cleaned up)).

his moped.

As Ferguson entered the shop, Hylton noticed that he needed an additional tool, so he ran after Ferguson, shouting, "Yo, Mr. Terry. Mr. Terry," wanting to get Ferguson's attention. The area where Hylton was shouting was near Davenport's minivan. While Hylton waited for Ferguson to come back outside with his tools, Hylton, for the first time that day, saw Davenport walking from his minivan toward him. Hylton had his hands in his pockets and "looked off" in a different direction, "trying not to make eye contact [with Davenport]," because Davenport had a violent reputation in the community and Hylton wanted to "g[i]ve him a wide berth." Davenport approached Hylton, who was looking to his left, from Hylton's right side and punched Hylton in the right jaw behind his ear. "After [Davenport] punched [Hylton] in the jaw, [Davenport] continued to physically attack [Hylton], including slamming [Hylton] on [a] car, punching [Hylton] in [his] face, particularly [in Hylton's] mouth, pull[ing] [Hylton's] hair out, and kicking [Hylton] with [Davenport's] boots." Additionally, "[Davenport] had . . . one of

3

[Hylton's] legs twisted and threaten[ed] to . . . break [Hylton's] leg if [Hylton did not] put the other one down because [Hylton] had one leg up trying to defend [himself]." Hylton had a gun in his waistband, but he did not draw it at that time.

Ferguson was about halfway through the shop when the fight started. He testified that he heard a "big bang" and assumed that a refrigerator or car engine had fallen. He went back outside to see what the noise was and saw Hylton on the ground and Davenport stomping on Hylton's face, neck, and head area. Ferguson also noticed that Hylton was bleeding from his head because Davenport had pulled Hylton's hair out.

Unbeknownst to him at the time, Ferguson inadvertently audio-recorded the fight when he was leaving a voicemail for someone he called while walking into the shop. On the recording, which was played at the hearing, Hylton can be heard repeatedly screaming, "What did I do," and calling out to Ferguson for help. Ferguson can be heard asking, "What is going on Davenport," and telling Davenport, "Don't do that to [Hylton]." Davenport can be

4

heard saying, among other things, "let my leg go, before I hurt you," "I told you about all that yelling," "I will not kill you; I will rape you," and "I will stomp your ass out right now." After about 20 to 30 seconds, Davenport stopped attacking Hylton and walked back in the direction of his minivan. Ferguson testified that Hylton appeared "beat up . . . , bloody, [and] swollen" after the fight. Ferguson also testified that, during the fight, Davenport threatened him, too, and that Ferguson grabbed his gun because he feared Davenport.

After the fight, Ferguson went back into the shop to get the tool Hylton needed, and then they walked to the moped. However, this tool was not the right one, so Ferguson went back to the shop. As Hylton waited for Ferguson to come back, he realized that he had "lost control of [his] bowels" during the fight and needed to go to his car to change clothes.[3] Hylton's car was parked across the street from Davenport's minivan.

While walking to his car, Hylton put his gun, which fell inside

---

[3] Ferguson, however, testified that he did not smell "human feces."

his pants during the fight, back in his waistband. As Hylton approached his car, he "noticed [Davenport] coming from behind" Davenport's minivan toward him. Hylton testified that Davenport "look[ed] angry," approached Hylton "in a threatening manner," and uttered something to the effect of "Oh, you're back." He also described Davenport as "running towards [him]" in an aggressive manner. Hylton could not say how far Davenport was away from him, only that Davenport was not close enough to strike Hylton. Hylton did not see a weapon on Davenport's person, but Hylton said he was afraid for his "safety because the last time . . . Davenport casually walked up [to Hylton, he] assaulted" him. So, Hylton drew his weapon and shot Davenport once. He "fired two more shots in rapid succession," killing Davenport, because Davenport "didn't appear to stop" after the first shot. Hylton testified that he intentionally fired the shots and was "mad" about the earlier altercation, but he did not shoot Davenport to get revenge and only fired his weapon because he was "overcome with fear." Ferguson did not see the shooting but testified that he heard three gunshots about

6

one to two minutes after the fight.

After the shooting, Hylton went back to his moped to get his phone and called 911 and his wife. He then continued to work on his moped, with Ferguson joining him a few moments later. Hylton, however, did not mention anything about the shooting to Ferguson. Officers arrived approximately two minutes after the shots were fired.[4] When officers found Davenport's body, which was about 30 yards from the shop in a brush area off the side of the road, they did not find any weapons on or near his body. Officers also recovered three 9mm Luger shell casings from near Davenport's body.

Hylton remained on scene, where he was placed under arrest. Police body camera footage showed Hylton limping into the police station, which the escorting officer noted as she led him to the interview room, and pulling strands of his hair from his pants pocket that came out during his fight with Davenport. Later, Hylton was transported to the hospital where he received a medical examination, including an x-ray and MRI. A medical report noted

---

[4] Hylton testified that it took police officers 30 minutes to arrive on scene.

that his only injury was a three-centimeter "superficial laceration" to the ear, for which he was prescribed a topical ointment.[5]

At the hearing on Hylton's motion for immunity, evidence was introduced of two interactions Hylton had with Davenport before the shooting. During the first incident, Hylton was parked in the same area where the shooting took place. Hylton and a female companion were sitting in the car when Davenport "came banging on the windows." Hylton told Davenport to leave him alone, but Davenport did not stop, prompting Hylton to leave the area. The second incident occurred three days prior to the shooting and involved Davenport pushing Hylton twice. Hylton contended that he did not engage Davenport and left on his moped.

2.    The State contends that the trial court's order granting Hylton's motion lacked sufficient findings of fact and conclusions of law to permit meaningful appellate review. The facts pertaining to this enumeration of error are as follows. After counsel made their

---

[5] In addition to the laceration behind his ear, Hylton claimed he suffered a swollen jaw, busted lips, and ongoing shooting headaches.

respective closing remarks at the immunity hearing, the trial court made the following statement on the record:

> COURT: All right. Mr. Hylton is seeking immunity [under] OCGA § 16-3-[2]4.2. You must establish [by a] preponderance of the evidence that he's entitled to immunity. The court's going to take this under advisement. The court wants to actually listen to the voicemail and render [a] decision. . . .

About a week after the hearing, the trial court held another hearing and stated the following on the record:

> COURT: So last week[,] Mr. Hylton brought before the court an immunity motion in which he requested that he be immune from criminal prosecution. The court has had ample opportunity to listen to evidence, testimony, listen to the video. Actually, I listened to the phone call three times yesterday with regard[ ] to Mr. Hylton's motion. And at this time, the court is going to grant Mr. Hylton immunity from prosecution based on the evidence and the testimony that was provided during that immunity motion. . . .

The trial court asked Hylton's counsel to draft an order, which was entered the same day. The order stated:

> On July 2, 2024, the above-styled case was before the Court for an evidentiary hearing on the Defendant's [m]otion for [i]mmunity from [p]rosecution (the "Motion").

During the hearing, the Court heard and considered the evidence and counsels' [sic] arguments. For the reasons the Court articulated on the record at the conclusion of the hearing, which reasons are incorporated by reference as though fully set forth in this Order, Defendant's Motion is hereby GRANTED. This case shall stand DISMISSED.

The State asserts that the trial court's order fails as a matter of law, as it does not articulate any specific findings of fact or conclusions of law that support its order and erroneously cites and incorporates by reference its oral findings, notwithstanding that no such findings were stated at the hearing. We disagree.

As the State acknowledges, OCGA § 16-3-24.2 does not require a trial court's order granting or denying immunity to include explicit factual findings or conclusions of law. See OCGA § 16-3-24.2 (providing that "[a] person who uses threats or force in accordance with Code Section 16-3-20, 16-3-21, 16-3-23, 16-3-23.1, 16-3-24, or 17-4-20 shall be immune from criminal prosecution therefor unless in the use of deadly force, such person utilizes a weapon the carrying or possession of which is unlawful by such person under Part 2 of Article 4 of Chapter 11 of this title"). And the trial court's

order is not otherwise inadequate to allow for meaningful appellate review.

Where the trial court fails to make any explicit factual findings or credibility determinations, "we presume implicit findings were made supporting the trial court's decision." *Davis v. State*, 306 Ga. 430, 432-433 (831 SE2d 804) (2019). While the trial court's order is brief, we are nevertheless able to infer that it must have concluded that Hylton carried his burden by showing by a preponderance of the evidence that deadly force was reasonably necessary to prevent Davenport from causing death or great bodily injury to Hylton. See OCGA § 16-3-21 (a) ("A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force . . . ."); *Gude v. State*, 313 Ga. 859, 871-872 (874 SE2d 84) (2022) (although the trial court "did not include any discussion about why it determined that [the defendant] had not carried his burden of showing that he reasonably believed deadly

force was necessary, and the denial of the motion at trial was a summary denial," the Court was able to infer from the denial of the defendant's motion that the trial court did not find the defendant's version of events credible). See also *State v. Hamilton*, 308 Ga. 116, 129 (839 SE2d 560) (2020) ("A trial court is free to consider a defendant's testimony when deciding a motion for immunity from prosecution and to make credibility determinations and factual findings based on all of the evidence before it — findings that this Court will accept so long as they are supported by any evidence." (cleaned up)). Thus, the State's contention that the trial court's order does not allow for meaningful appellate review fails.

3. The State contends that Hylton's use of force was not reasonably necessary and, therefore, he was not entitled to immunity under the statute. The State acknowledges that Davenport, unprovoked, attacked Hylton in the first confrontation but contends that immediately prior to the shooting, there was no evidence that Davenport made any threats, warnings, or menaces or brandished any weapons that would warrant Hylton using deadly

12

force. Again, we disagree.

As discussed above, to prevail on his motion for pretrial immunity under OCGA § 16-3-24.2, Hylton was required to establish a justification defense under OCGA § 16-3-21 by a preponderance of the evidence. See *Hamilton*, 308 Ga. at 128; OCGA § 16-3-21 (a). On appeal of an order granting or denying immunity under OCGA § 16-3-24.2, "we accept the trial court's findings with regard to questions of fact and credibility if there is any evidence to support them." *State v. Sutton*, 297 Ga. 222, 222 (773 SE2d 222) (2015) (cleaned up).

Accordingly, viewing the evidence in the light most favorable to the trial court's ruling, the evidence presented at the hearing showed the following. In the days prior to the shooting, Davenport, without apparent justification, acted aggressively toward Hylton twice, with one of those incidents taking place just days before the shooting. Davenport's aggressive tendencies, however, were not reserved solely for Hylton, as Ferguson, who grabbed his own gun the day of the beating because he was fearful of Davenport, testified

13

that Davenport was known to have a violent reputation in the community. On the day of the shooting, Davenport, unprovoked, severely beat Hylton, stomping on Hylton's head and pulling out his hair, and even remarked that he would "rape" Hylton. Not long after that, as Hylton was walking to his car to change his soiled clothing, Davenport began to approach Hylton in an "aggressive manner" and then ran at Hylton.

The trial court was authorized to implicitly credit evidence of Davenport's violent reputation, the earlier beating, and Davenport's aggressive demeanor as he ran at Hylton immediately prior to the shooting. And this evidence supports the court's implicit conclusion that it was objectively reasonable for Hylton to believe that Davenport would cause great bodily injury or death if Hylton did not defend himself with deadly force. See, e.g., *Hamilton*, 308 Ga. at 118, 128-129 (trial court did not err in finding that a preponderance of evidence showed that the defendant shot her husband in self-defense, entitling defendant to immunity from prosecution, where evidence showed that the victim was "in the midst of attacking" the

14

defendant when she shot him, and the victim had inflicted routine and ongoing physical abuse on the defendant); *Sutton*, 297 Ga. at 222-225 (affirming grant of immunity from prosecution where evidence showed that the defendant "repeatedly told the [victim] not to come any closer, but the [victim] nevertheless continued to proceed through the doorway" of the defendant's mother's home prior to shooting the unarmed victim, and the defendant was aware of three other instances of violence committed by the victim) (cleaned up). Cf. *Johnson v. State*, 304 Ga. 610, 613-614 (820 SE2d 690) (2018) (the trial court did not err in denying the defendant's motion for immunity from prosecution where the evidence showed that despite the victim making threatening statements to the defendant and his girlfriend days prior to the shooting, at the time of the shooting, the victim was unarmed and did not "make any aggressive moves"). Therefore, construing the evidence in the light most favorable to the trial court's ruling, we conclude that the trial court did not err in implicitly finding that Hylton showed by a preponderance of the evidence that he shot Davenport because he

reasonably believed such force was necessary to prevent death or great bodily injury to himself.

*Judgment affirmed. All the Justices concur.*

Decided March 18, 2025.

Murder. DeKalb Superior Court. Before Judge Parker-Smith.

*Sherry Boston, District Attorney, Jason M. Rea, Deborah D. Wellborn, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General*, for appellant.

*Daniel H. Petrey, Annie C. Deets*, for appellee.